# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON



STATE OF TENNESSEE,

     Appellee,

Vs.

TERESA DEION SMITH HARRIS,

     Appellant.

)
)
)
)
)
)
)
)
)
)
)

FOR PUBLICATION

**Filed: April 12, 1999**

Hon. Julian P. Guinn
Judge

HENRY COUNTY

Supreme Court
No. 02-S01-9806-CC-00053

APPELLANT
Shipp Weems
District Public Defender
Charlotte, Tennessee

Steve West
West & West
McKenzie, Tennessee
(TRIAL ONLY)

FOR APPELLEE:
John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Peter M. Coughlan
Assistant Attorney General
Nashville, Tennessee

G. Robert Radford
District Attorney General

# O P I N I O N

AFFIRMED.

DROWOTA, J.

We granted this appeal to determine whether the constitutional harmless error analysis delineated in State v. Howell, 868 S.W.2d 238 (Tenn. 1993), applies when a jury renders an incomplete verdict as to one of the two aggravating circumstances upon which a sentence of life imprisonment without the possibility of parole is based.

Although we agree that the incomplete finding is erroneous because the jury did not apply the aggravating circumstance prescribed by the General Assembly, the error does not implicate constitutional Eighth Amendment concerns because no death sentence is involved. Therefore, in the context of this appeal from a sentence of life imprisonment without the possibility of parole, the error is statutory, and the constitutional harmless error analysis delineated in Howell does not apply.

A statutory error is not reversible unless it either affirmatively appears to have affected the result of the trial on the merits,[1] or the error involved a substantial right which more probably than not affected the judgment or would result in prejudice to the judicial process.[2] To establish that the jury's reliance upon the invalid aggravating circumstance satisfies either of these standards, the defendant must show that the jury grossly abused its discretion by arbitrarily sentencing her to life imprisonment without the possibility of parole.[3] The

---

[1]Tenn. R. Crim. P. 52(a).

[2]Tenn. R. App. P. 36(b).

[3]Tenn. Code Ann. § 39-13-207(g) (1997 Supp.) provides in pertinent part that "[a] sentence of imprisonment for life without the possibility of parole shall be considered appropriate if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion."

defendant has failed to make this showing. Accordingly, the judgment of the Court of Criminal Appeals which upheld her conviction and sentence is affirmed.

## BACKGROUND

The defendant, Teresa Deion Smith Harris, was convicted of first degree felony murder. The evidence introduced at the guilt phase of the trial established that on July 30, 1993, the defendant, her live-in boyfriend, Walter Smothers, and a neighbor, Stacy Ramsey, spent the day at the defendant's house drinking tequila, whiskey, and beer, and smoking marijuana. Smothers was also taking Valium.

The defendant's ex-boyfriend, David Hampton called her home several times throughout the day. Smothers answered the telephone on one occasion and argued with Hampton. The conversation ended when Smothers and Hampton agreed to meet and fight. Later that evening, the defendant, Smothers, and Ramsey left to go to Hampton's house. Smothers asked Ramsey to bring along his .20 gauge shotgun.

The trio departed in Ramsey's pickup truck, and after leaving the defendant's two young children at their grandmother's home, they drove around Carroll County for sometime, drinking alcohol and searching for Hampton's house. The defendant testified that she knew the location of Hampton's house but was afraid to direct Smothers to it. At some point, they tried to buy motor oil for Ramsey's truck but could find no store open, so they continued the search for Hampton's house.

Eventually, at around 12:00 a.m., the truck broke down on Highway 114 near Hollow Rock.[4]  To obtain transportation, the defendant, Smothers, and Ramsey decided to stop the next vehicle that approached and take it from the driver.  They discussed that they might be required to kill the driver of the vehicle.  Smothers believed that an approaching vehicle would be more likely to stop for a young woman, so he urged the defendant to flag down the vehicle.  She agreed, and when the headlights became visible, Harris stood on the side of the road and flagged down the approaching vehicle while Smothers and Ramsey hid behind the truck.

The truck, a Ford Ranger, was driven by the victim, nineteen-year-old Dennis Brooks, Jr.  He had just finished his shift at Subway and was traveling home at approximately 12:30 a.m.  When Brooks stopped, Ramsey and Smothers emerged from their hiding place.  Smothers held the .20 gauge shotgun on Brooks and ordered him to get out of his truck.  Ramsey forced Brooks to lie on the ground, and the defendant ran up to Brooks, punched him two or three times in the back, cursed him, and told him to lie down on the ground.  At trial, the defendant claimed that her actions were intended to force Brooks to be quiet so that Smothers would not harm him.  However, according to nearby residents who were awakened by the commotion and heard the defendant shouting, the defendant's voice sounded "mean" and "very hateful."

Smothers demanded money from Brooks, took his wallet and forced him to get onto the back of the victim's pickup truck.  The defendant and Ramsey got into

_____

[4]The truck broke down less than one mile from Hampton's home.

the cab of the truck. Ramsey drove and, as the truck began to move, Smothers decided to climb into the cab of the truck through the rear sliding glass window. Smothers asked Ramsey to slow down and gave the gun to the defendant to hold on Brooks while he climbed through the window. Testimony diverged as to what happened next. Smothers said that while the defendant was still holding the gun, Ramsey accelerated, causing the truck to jerk and the gun to discharge and shoot the victim in the hip. In contrast, the defendant testified that she had given the gun back to Smothers, turned back around in the seat, and then heard the gun discharge and shoot the victim in the hip. According to the defendant, Smothers told her he had accidentally shot the victim. Ballistics testimony at trial indicated that to fire the gun which was used to shoot the victim, a person would have to both pull back the hammer and press the trigger.

In any event, after being shot, the victim began to scream and cry out in pain. Ramsey, Smothers, and Harris yelled at him to shut up. According to the defendant, Smothers initially agreed to take Brooks to a hospital but did not follow through on his promise, and instead the group continued to drive around in the country for another 20 or 30 minutes searching for Hampton's house. As lights from a town became visible, the victim again began to scream for help. Afraid someone would hear the screaming, Smothers put the gun under the victim's chin and fired. Smothers testified that Ramsey, the defendant, or a voice inside his head told him to shoot the victim.

After the fatal shooting, the trio continued to drive around in the area. While speeding through the town of Hollow Rock, they were pursued by a police

officer, but were able to evade apprehension and eventually traveled back to the defendant's home. They discussed how to dispose of the victim's body and decided to bury his body and truck with a backhoe to which Ramsey had access. However, this plan had to be abandoned because the backhoe had a flat tire, so they decided to bury the victim's body and burn the vehicle.

Smothers obtained an ax and a shovel from Ramsey's home, and the defendant retrieved a butcher knife from her kitchen. Ramsey and Smothers drove the victim's truck to a deserted area known as Haunted Bridge. The defendant followed in her car. Once there, the group decided to dismember the victim's body to make burial easier and to give the impression that "nobody around here did it."

The medical examiner testified at trial that the victim had died from the gunshot wound to his head, but also stated that the gunshot wound to the victim's hip would have resulted in excruciating pain and alone would have been sufficient to result in death due to the tremendous amount of blood loss. The medical examiner also recounted the post-mortem mutilation of the victim's body, testifying that the victim had been stabbed numerous times and that his legs, right arm, and penis had been severed from his body. The victim's chest cavity had been cut open and his heart had been removed and placed back inside his abdominal cavity. The medical examiner testified that the victim's heart had discolored areas on it which were consistent with a person sucking blood from it.

According to Smothers, he and Ramsey each had severed one of the

victim's legs and Ramsey had severed the victim's right arm. Smothers admitted that he had removed the victim's heart, but said he had done so because the defendant had told him that she "wanted his heart." Smothers said that he, Ramsey, and the defendant had each held the victim's heart and pressed it to their lips. The defendant admitted stabbing the victim's body once and touching the victim's heart to her lips, but she claimed that she had acted at Smothers direction and said that she had been afraid to disobey him after he had shot and killed the victim. The defendant otherwise denied all participation in the mutilation.

After mutilating the victim's body, the trio returned to the defendant's home, obtained gasoline and lantern fuel, and drove the truck into an empty field. After removing a radio, speaker and several personal items,[5] they set the truck afire with the victim's mutilated body inside the cab. Ramsey and Smothers drove the victim's truck to the burn site with the defendant following in her own car. After the fire was ignited, they all returned to the defendant's home. They all showered and the defendant laundered their blood-stained clothes.

The day after the night of the murder, the defendant and Smothers returned to the victim's truck and, discovering it had not completely burned, again set the truck afire. They concocted an alibi to conceal their actions and the events of the previous night. Later that evening the three "partied" at Ramsey's house until around 8:00 p.m. and then went to an establishment called Casey's Bar and continued to consume alcohol. According to the owner of the Bar, the defendant was "more active" than usual. She played pool and sang with the jukebox. She

---

[5]These items were recovered from the defendant's house after she consented to a search.

was wearing a hat and sunglasses which were later identified as belonging to the victim.

The victim's parents had reported him missing on the afternoon of July 31, 1993, the day following the murder. While searching for the victim with a helicopter, law enforcement officials spotted the smoke from his burning truck. An investigation followed, and rather quickly, law enforcement officials arrested Ramsey, Smothers, and the defendant. All three were indicted and charged by a Carroll County grand jury in a two count indictment with premeditated first degree murder and first degree felony murder. The State filed a notice of intent to seek the death penalty as to each defendant.

Upon request, the trial court severed the action and ordered three separate trials. The defendant was tried first. The venue was changed due to the magnitude of pretrial publicity. The defendant's trial was held in Henry County. At the end of the proof, the State elected to proceed on the charge of first degree felony murder charge. Upon hearing the proof as summarized above, the jury found the defendant guilty of first degree felony murder.

At the sentencing hearing, the State sought the death penalty upon the basis of two aggravating circumstances: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(5) and (6) (1997 Repl.).

The State relied upon the evidence presented at the guilt phase of the trial. The State also called as a witness the victim's father, who asked the jury not to impose the death penalty, but to impose instead a sentence of life imprisonment without the possibility of parole.

The defendant testified in her own behalf and also offered the testimony of Cynthia Taylor, her sister, Dr. Phillip Carl Morson, a staff physician from Western Mental Health Institute, and Dr. Gillian Blair, a clinical psychologist. The defendant expressed sorrow to the victim's family for the murder and said that she would not have stopped his truck if she had known it would eventually result in his death.

From the testimony of the defendant's sister, the jury learned that the defendant, twenty-three at the time of trial, is the middle child in a family of three, with an older sister, Taylor, twenty-eight at the time of trial, and a younger brother, eighteen at the time of trial. The defendant's father was employed as a school bus driver in Carroll County and also owned a small engine shop. Her mother had suffered from severe rheumatoid arthritis since shortly after the defendant's birth, and at the time of trial was unable to walk without crutches. Because of her mother's illness, the defendant's grandmother had cared for her a great deal until the grandmother was killed in an automobile accident when the defendant was twelve-years-old.[6] The defendant had begun drinking alcohol shortly after her grandmother's death and had become an alcoholic.

---

[6]Taylor also testified that the defendant had been sexually abused since the age of twelve, but because Taylor did not wish to disclose the identity of the abuser, defense counsel did not pursue this line of questioning.

Though the defendant has repeatedly sought treatment, she has been unable to successfully control the addiction. The defendant also abuses drugs, including morphine and cocaine. At the age of fourteen, the defendant attempted to commit suicide by taking an overdose of Tylenol and, as a result, was hospitalized for treatment. The defendant became pregnant and bore her first child while she was enrolled in high school. She was able to utilize a homebound teacher to stay current on her studies. Eventually the defendant returned to classes and graduated even though she continued to use drugs and alcohol.

Following graduation, the defendant again became pregnant and married Jim Harris. The defendant and Harris abused drugs regularly during their marriage which eventually ended in a divorce. Thereafter, the defendant met and dated David Hampton for approximately one year. Hampton abused drugs and also physically abused the defendant. On one occasion, the defendant was hospitalized as a result of the abuse. When her relationship with Hampton ended, the defendant began dating Smothers. They had lived together for approximately two to three weeks before this killing occurred.

On cross-examination Taylor admitted that the defendant had been rebellious since the age of twelve, that she would not listen to the instruction of her parents, and that she has made very poor choices with regard to relationships with men. Taylor said that both she and her mother had tried to help the defendant "in every way" by seeking professional help but that none of their efforts had been successful.

Dr. Morson, a staff physician at Western Mental Health Institute, testified that he had treated the defendant beginning on January 15, 1994, after she had attempted to commit suicide while incarcerated for the victim's murder. At that time, the defendant was diagnosed as suffering from major depression with psychotic features and post-traumatic stress disorder, with post-traumatic stress disorder being the primary diagnosis. According to Dr. Morson, the traumatic event which precipitated the onset of the defendant's post-traumatic stress disorder was her witnessing and participation in the victim's murder. In her admission statement, the defendant had said "I'm going to kill myself. I don't deserve to live after what I did."

Dr. Morson described the defendant as "a very anxious person, a very guilt-ridden person, a very distraught person, a person who was . . . re-experiencing the events of last summer, was actually at times feeling like the deceased was in the room with her, was hearing his voice begging; and was driven to just extreme anxiety about this, driven to suicidal attempts by this, driven to not want to be alive by this, over and over again, driven to the point where at times she was so distracted that she was almost not there." Dr. Morson said the defendant would cry and twist her hair each time the subject was brought up and felt extremely guilty "because she could not stop the events that happened; that she could not stop Walter [Smothers] from doing what he did; that she didn't have the courage to do anything about this. . . ." The defendant expressed remorse and regret for her actions, according to Dr. Morson, and repeatedly stated that "she didn't know how she could go on living with this." She also attempted to commit suicide on one occasion while hospitalized at Western State.

Based upon an interview and evaluation of the defendant on February 18, 1994, Dr. Blair, a clinical psychologist, diagnosed the defendant as suffering from severe depression and post-traumatic stress disorder. Dr. Blair also testified that the defendant has substance dependence and some elements of a personality disorder. Dr. Blair opined that the defendant is passive and dependent and makes poor decisions.

Dr. Blair stated that the defendant had reported to her that she had been raped and had been sexually abused by the rapist since the age of twelve. The defendant reported the abuse to her parents but was not believed. According to the defendant's statement, the alleged perpetrator later admitted the abuse but was never prosecuted. Following the rape, Dr. Blair said the defendant began using various drugs and attempted suicide multiple times. Dr. Blair opined that the defendant participated in the murder of the victim because she is dependent upon men and, as a result, followed the directions of Walter Smothers.

On cross-examination, Dr. Blair admitted that any post-traumatic stress that the defendant now suffers would not have impacted her actions on the night of the murder, July 30, 1993. Also, Dr. Blair conceded that the defendant's noncompliance with her parents' instructions could be considered inconsistent with her assessment of the defendant as a dependent personality.

Based upon this proof, the jury rejected the death penalty and imposed a sentence of life imprisonment without the possibility of parole. The trial judge instructed the jury in accordance with the language of the statute with respect to

the two aggravating circumstances upon which the State had relied. The verdict

form reflected that the jury had found "[t]he murder was committed for the purpose

of avoiding, interfering with, or preventing a lawful arrest or prosecution of the

defendant or another." Tenn. Code Ann. § 39-13-204(i)(6) (1997 Repl.). With

respect to the second aggravating circumstance, the verdict form indicated that

the jury had found only that "[t]he murder was especially heinous and atrocious."

When the trial judge noticed the variation between the jury's finding and the

actual statutory language of the aggravating circumstance, the following colloquy

occurred.

> THE COURT: I notice that where you set out the aggravating
> circumstance number one that you do not have the entire
> aggravating circumstance written out. Is there some reason?
>
> JURY FOREMAN: Well, we just
>
> THE COURT: Was it intended to be that you found the entire
> circumstance there?
>
> JURY FOREMAN: Well, just what I've got written out.
>
> THE COURT: You've written here that you found that the murder
> was especially heinous and atrocious.
>
> JURY FOREMAN: Yes, sir.
>
> THE COURT: You have omitted that it was cruel, involved torture or
> serious physical abuse beyond that necessary to produce death. Is
> that what you intended for it to be?
>
> JURY FOREMAN: Yes, sir.
>
> THE COURT: All right, but then you have found that the second
> aggravating circumstance there in its entirety is correct.
>
> JURY FOREMAN: Yes, sir.
>
> THE COURT: Based upon that you fixed a sentence of life

imprisonment without the possibility of parole. Have I read it correctly?

JURY FOREMAN: That's correct.

Following this exchange, the trial judge entered a judgment in accordance with the jury's verdict which found the defendant guilty of first degree felony murder and imposed a sentence of life imprisonment without the possibility of parole.

On appeal, the defendant challenged the validity of her sentence and argued that she should be given a new sentencing hearing because the jury rendered an incomplete verdict with respect to one of the two aggravating circumstances upon which the sentence had been based. A majority of the Court of Criminal Appeals rejected her claim and affirmed the conviction and sentence imposed. One judge dissented from the majority decision, concluding that the jury had erroneously returned an incomplete verdict with respect to one of the two aggravating circumstances. Applying the analysis delineated in State v. Howell, 868 S.W.2d 238 (Tenn. 1993), the dissenting judge concluded that the error was not harmless beyond a reasonable doubt.

Thereafter we granted the defendant's application for permission to appeal and now affirm the decision of the Court of Criminal Appeals which upheld the defendant's conviction of first degree felony murder and the sentence of life imprisonment without the possibility of parole.

-14-

## HARMLESS ERROR ANALYSIS

In this Court, the defendant argues that she should be given a new sentencing hearing because the jury rendered an incomplete verdict with respect to one of the aggravating circumstances upon which her sentence was based. Relying upon the analysis delineated in Howell, supra, the defendant argues that the error is not harmless.

The State concedes that the jury's incomplete finding with respect to the (i)(5) aggravating circumstance constitutes error. However, the State asserts that the Howell analysis does not apply because the error is statutory rather than constitutional. According to the State, the error is harmless because it does not affirmatively appear to have affected the sentencing verdict to the defendant's prejudice. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

To resolve the issue in this appeal we must first determine whether the error complained of is constitutional or statutory.[7] The answer to this question is important because the test for harmlessness of constitutional errors differs from that for nonconstitutional errors. First, once a constitutional error is found, the burden shifts to the State to prove harmlessness; the burden does not shift to the state for nonconstitutional errors. James C. Scoville, Deadly Mistakes: Harmless Error in Capital Sentencing, 54 U.Chi. L. Rev. 740, 741-42 (1987). Second, the

---

[7]In so stating, we note our agreement with both the defendant and the State that the jury's incomplete finding with respect to the (i)(5) aggravating circumstance was error. We also again reiterate that "[w]here the jury reports an incorrect or imperfect verdict, the trial court has both the power and duty to redirect the jury's attention to the law and return them to the jury room with directions to reconsider their verdict." State v. Nichols, 877 S.W.2d 722, 730 (Tenn. 1994). The trial court in this case failed to follow that procedure despite its realization that the jury's verdict was incomplete with respect to the (i)(5) aggravating circumstance.

standard which applies to assess the harm or prejudice resulting from constitutional errors is more exacting than the standard which applies to nonconstitutional errors. Id.; see also 3A Wright & Miller, Federal Criminal Practice and Procedure § 855 (2d ed. 1982).

For example, in Tennessee, nonconstitutional errors will not result in reversal unless the error affirmatively appears to have affected the result of the trial on the merits, or considering the whole record, the error involves a substantial right which more probably than not affected the judgment or would result in prejudice to the judicial process. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b); State v. Cook, 816 S.W.2d 322, 326 (Tenn. 1991); State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998). In contrast, a constitutional error will result in reversal unless the reviewing court is convinced "beyond a reasonable doubt" that the error did not affect the trial outcome. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Howell, 868 S.W.2d at 260; Cook, 816 S.W.2d at 326; Tenn. R. Crim. P 52(a). Finally, and perhaps most significantly, though any nonconstitutional error may be considered harmless in a particular case, there are some constitutional errors which defy harmless error analysis and will always require reversal.[8]

The defendant reasons that the error in this case is constitutionally based because, like Howell, the jury's sentencing determination was based in part upon an invalid aggravating circumstance. There is an important and vital distinction,

_____

[8]Chapman, 386 U.S. at 23, 87 S.Ct. at 827, (citing e.g. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)(right to counsel); Tumey v. State of Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (right to impartial judge)); see also Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); State v. Bobo, 814 S.W.2d 353, 358 (Tenn. 1991).

-16-

however, which the defendant has overlooked. Unlike <u>Howell</u>, this appeal does not involve a sentence of death.

In <u>Furman v. Georgia</u>, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court held that the death penalty may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. Therefore, if a State decides to authorize capital punishment, the federal constitution requires that it tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. <u>Godfrey v. Georgia</u>, 446 U.S. 420, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980). This constitutional responsibility requires states, as a first step, to adopt procedures to narrow the class of persons eligible for the death penalty. <u>Zant v. Stephens</u>, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). Narrowing may be accomplished either by providing restrictive definitions of first degree or capital murder or by utilizing aggravating circumstances at the sentencing hearing. <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In Tennessee, narrowing is accomplished by use of aggravating circumstances at the sentencing hearing. <u>State v. Middlebrooks</u>, 840 S.W.2d 317 (Tenn. 1992).

Once a method of narrowing is chosen, the standards employed must be "clear and objective" and provide "specific and detailed" guidance which both channels the sentencer's discretion and makes rationally reviewable the process for imposing a sentence of death. <u>Godfrey</u>, 446 U.S. at 428, 100 S.Ct. at 1765. A State's death penalty scheme may not employ aggravating circumstances which

are so vague that they fail to channel the sentencing decision of jurors and result in arbitrary and capricious sentencing. Gregg v. Georgia, 428 U.S. 153, 195 n. 46, 96 S.Ct. 2909, 2935 n. 46, 49 L.Ed.2d 859 (1976). Significantly, in the death penalty context, jury findings of statutory aggravating circumstances similar to the jury's finding in this case have been held to be unconstitutionally vague. Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (jury imposed the death penalty upon finding aggravating circumstance that the murder was "especially heinous, atrocious, or cruel" and court held the statutory language unconstitutionally vague because it did nothing "to cure the unfettered discretion of the jury and to satisfy the commands of the Eighth Amendment"); Godfrey, 446 U.S. at 428-29, 100 S.Ct. at 1764 ( jury found the murder was "outrageously or wantonly vile, horrible or inhuman" and the finding was held unconstitutionally vague "because there is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence").

However, these Eighth Amendment constitutional narrowing requirements and vagueness prohibitions have not been extended to cases which do not involve the death penalty. See Harmelin v. Michigan, 501 U.S. 957, 995, 111 S.Ct. 2680, 2701, 2702, 115 L.Ed.2d 836 (1991). In Harmelin, a case involving a sentence of imprisonment for life without the possibility of parole, Justice Scalia explained the Court's reluctance to extend these constitutional requirements beyond the capital sentence context as follows:

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique,

-18-

finally, in its absolute renunciation of all that is embodied in our concept of humanity.

Harmelin, 501 U.S. at 995-96, 111 S.Ct. at 2702 (quoting Furman, 408 U.S. at 306, 92 S.Ct. at 2760 (Stewart, J., concurring)).

Recently in State v. Butler, 980 S.W.2d 359 (Tenn. 1998), this Court adopted Justice Scalia's rationale that the death penalty is unique to all other forms of punishment. As a result, we refused to apply the narrowing requirement adopted in Middlebrooks, supra, to proceedings in which the State is seeking a sentence of life imprisonment without the possibility of parole. Instead we held that the constitution does not bar the State from relying upon the felony murder aggravating circumstance to support imposition of a sentence of life imprisonment without the possibility of parole even though the defendant has been convicted of first degree felony murder.

Therefore, while the jury's finding in this case would have implicated constitutional vagueness concerns had the jury imposed a sentence of death,[9] those same constitutional concerns do not apply outside the death penalty context and are not implicated in this appeal from the defendant's sentence of life imprisonment without the possibility of parole.

---

[9]For purposes of clarity, we emphasize that it is only the jury's incomplete finding in this case, "the murder was especially heinous and atrocious," which would raise constitutional vagueness concerns in the death penalty context. In contrast, the statutory aggravating circumstance in its entirety, "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," previously has been upheld against constitutional vagueness attacks in the death penalty context. E.g. State v. Odom, 928 S.W.2d 18, 25-27 (Tenn. 1996). We reiterate that unlike the jury finding which was held constitutionally invalid in Godfrey, supra, and the aggravating circumstance held constitutionally invalid in Maynard, supra, the language of our statutory aggravating circumstance is constitutional on its face because it requires a finding of torture or serious physical abuse beyond that necessary to produce death. See State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989).

-19-

Accordingly, the jury's incomplete finding with respect to the aggravating circumstance is not constitutional error, but is instead an erroneous deviation from the statutory scheme adopted by the General Assembly to govern imposition of sentences of life imprisonment without the possibility of parole. Cf. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (right to instruction on nonstatutory mitigating circumstances derives from statute not constitution; therefore refusal to instruct on nonstatutory mitigating circumstances is statutory rather than constitutional error).

Having concluded that the error is statutory rather than constitutional in nature, we must next explain the showing necessary to establish that the error has affirmatively or more probably than not affected the judgment to the defendant's prejudice. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). To resolve this question, we focus upon the sentencing scheme for first degree murder.

When a defendant is convicted of first degree murder in a case in which the State is seeking the death penalty, three sentencing options exist, life imprisonment, life imprisonment without the possibility of parole, or death. Tenn. Code Ann. § 39-13-204 (1997 Repl.). A life sentence is mandatory if the jury finds that the State has not proven any statutory aggravating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(f)(1) (1997 Repl.). A death sentence is appropriate if the jury unanimously finds both that the State has proven at least one or more statutory aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances proven outweigh mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-

204(g)(1) (1997 Repl.).  However, if, as in this case, the jury determines that the State has proven one or more statutory aggravating circumstances, but concludes that the circumstance or circumstances so proven do not outweigh mitigating circumstances beyond a reasonable doubt, the jury may impose a sentence of either life imprisonment or life imprisonment without the possibility of parole. Tenn. Code Ann. § 39-13-204(f)(2) (1997 Repl.).  In determining which sentence to impose, the statute provides only that the jury must "weigh and consider the aggravating and mitigating circumstances."  Id.  The statute does not require the jury to determine that the aggravating circumstances proven outweigh the mitigating circumstances by any specific level of proof to impose a sentence of life imprisonment without the possibility of parole.  Id.

In recognition of the substantial discretion afforded jurors in determining which sentence to impose, the statute governing appellate review declares that "[a] sentence of imprisonment for life without the possibility of parole shall be considered appropriate if the State proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion."  Tenn. Code Ann. § 39-13-207(g) (1997 Repl.).[10]

Under this statutory scheme, when a sentence is based in part upon one or

---

[10]We observe, however, that the statutory scheme with regard to the manner of sentencing and appellate review in life without parole cases needs further clarification by the Legislature.  As we have discussed, Tenn. Code Ann. § 39-13-204(f)(2) allows a jury to impose a sentence of either life or life without parole upon a finding of at least one aggravating circumstance.  There are no required findings or standards for choosing one sentence or the other.  Thus, in any case where at least one valid aggravating circumstance has been found, there are few practical means by which an appellate court can determine whether a sentence of life without parole was a 'gross abuse' of the jury's discretion under § 207(g).

-21-

more invalid aggravating circumstances, but at least one valid aggravating circumstance remains, the jury's reliance upon the invalid aggravating circumstance is not reversible error under either Tenn. R. Crim. P. 52(a) or Tenn. R. App. P. 36(b) unless the defendant demonstrates that the jury grossly abused its discretion by arbitrarily imposing the sentence.

Applying that standard to the facts in this case, it is clear that the jury's reliance upon the incomplete aggravating circumstance is harmless error. Clearly, one valid aggravating circumstance remains to support the defendant's sentence. The jury found proof beyond a reasonable doubt that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6) (1997 Repl.). The testimony of both the defendant and Smothers, who said that the victim was shot the second time because he began to scream for help as they drove into a populated area, support the jury's finding of this aggravating circumstance. The defendant offers no specific argument which demonstrates that the jury grossly abused its discretion by imposing a sentence of life imprisonment without the possibility of parole beyond her assertion that a new sentencing hearing is necessary because the jury relied upon the incomplete aggravating circumstance. Furthermore, nothing in the record suggests that the sentence was imposed arbitrarily so as to constitute a gross abuse of the jury's discretion. In sum, the defendant has failed to establish that the jury grossly abused its discretion by imposing a sentence of life imprisonment without the possibility of parole. Accordingly, the jury's reliance upon the incomplete and invalid aggravating circumstance was harmless error in this case.

-22-

## CONCLUSION

For the reasons previously explained, we conclude that the incomplete finding as to the aggravating circumstance constitutes statutory error which, in this case, is harmless because the defendant failed to establish that the jury grossly abused its discretion by arbitrarily imposing a sentence of life imprisonment without the possibility of parole. Accordingly, the judgment of the Court of Criminal Appeals which upheld the defendant's conviction and sentence is affirmed.

_____
FRANK F. DROWOTA, III
JUSTICE

**Concur:**

Anderson, C.J.
Birch and Holder, JJ.

Hayes, Sp. J. - Separate Concurring Opinion