IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 16, 2003 Session

## STATE OF TENNESSEE v. TAVARUS LA'TRENT MARTINDALE

**Appeal from the Circuit Court for Giles County**
**No. 10164     Stella L. Hargrove, Judge**

---

**No. M2003-00051-CCA-R3-CD - Filed February 20, 2004**

---

The defendant, Tavarus La'Trent Martindale, was convicted by a jury in the Giles County Circuit Court of murder in the first degree and sentenced to life in prison without the possibility of parole. In this appeal as of right, the defendant contends (1) that the evidence is insufficient to convict him of murder in the first degree, (2) that the trial court erred by not excluding the autopsy evidence, and (3) that the trial court's sentencing instructions to the jury were unclear as to the standard for imposing life in prison without the possibility of parole or for imposing life in prison. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

J. Christopher Williams, Lawrenceburg, Tennessee, for the appellant, Tavarus La'Trent Martindale.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Robert C. Sanders and Patrick S. Butler, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case relates to the killing of Foster Russell on June 9, 2001. Giles County Sheriff Eddie Bass testified that he received two anonymous calls telling him that the victim had been killed and that his body was in a creek. He said that four days later, he received a third call in which the caller stated that the defendant had killed the victim, that David Bradley had disposed of the victim's body, and that Sheila Wilson had been involved in the killing. He said that based on an interview with Bradley, the police found the victim's body in a creek underneath a bridge. He said that when the defendant was taken into custody, the defendant said, "Eddie, I did this. I want to ple[a]d guilty, and let's get out of here."

David Bradley testified that he was charged with accessory after the fact of first degree murder, pled guilty, and received probation in exchange for his testimony against the defendant. He said that on June 8, 2001, he spent the night at Kristie Collins' trailer, which was owned by John McClure. He said Collins,[1] her two children, McClure, and Tina Boivin were also there. He said that the victim showed up at the trailer at about 1:00 a.m. but that he told Collins and Boivin not to let him in because there might be trouble. He said Collins let the victim in anyway. He said the victim told him that he had been at the defendant's home but that he had left because he was scared. He said that the victim slept on the couch in the living room and that he, Boivin, and Collins were in one bedroom while McClure slept in another.

Bradley testified that about one hour after the victim had knocked on the door, the defendant, SheilaWilson, George Martindale, and J.D. Lighter arrived. He said he and Collins went to the living room to meet them. He said the defendant knocked on the door and asked if the victim was there. He said the victim responded from the couch that he was. He said that the defendant went into the trailer and started shooting the victim with a pistol and that after three shots, he heard the victim say, "Oh, god-damn, god-damn, god-damn." He said the defendant then stated, "Yeah, you snitching son-of-a-bitch, I knowed I'd catch you slipping." Bradley said the defendant shot the victim six times before the defendant's gun fell apart. He said the defendant told Bradley to help him find the gun piece that had fallen out of the gun. Bradley said that he found the piece and that the defendant fixed his gun. He said that when the victim exclaimed that he was dead, the defendant responded, "You can't be[, you] snitching son-of-a-bitch. You're talking to me." He said the defendant shot the victim several more times. He said the defendant told him and Collins that if they told anyone about the shooting, he would kill them. He said the defendant went back to the victim and shot him twice in the back of the neck at point blank range. He said that Lighter then hit Bradley and that either the defendant or Lighter poured grease from a frying machine onto the victim.

Bradley testified that the defendant told him to move the victim's body and that the defendant hit him with his gun when he refused. Bradley said that he dragged the body outside and that the defendant shot the victim once more, stating that he wanted to make sure the victim was dead. He said the defendant told him to get rid of the body or he would kill everyone. He said the defendant told them that he would be back in thirty minutes to make sure that they had disposed of the body. He said that he found McClure in a field behind the trailer and that they put the victim's body in the trunk of McClure's car. He said he and McClure drove to a bridge and dumped the victim's body over it. He said that after they returned to the trailer, the defendant returned and demanded to see the victim's body but Bradley refused.

Bradley testified that the defendant told them that he would not hurt any of them if they did not talk about the killing. He said that after the victim's death, the defendant came to the trailer every day and brought them drugs. He said that a few days after the killing, the defendant told them that they should burn the couch and rug at the trailer. He acknowledged that when the police

---

[1]Kristie Collins is also called Kristie Oliver in the transcript and the parties' briefs. When questioned at trial, she said both names were correct.

interviewed him the first time, he lied to them because he was scared. He acknowledged using crack cocaine.

On cross-examination, Bradley testified that the defendant was not with them when they dumped the body or when the couch and rug were burned. He said that there was drug use at the trailer, that people came by often to buy drugs, and that the victim had bought drugs from them in the past. He said that although in his statement to the police he said he was intoxicated on the night of the killing, he did not remember if he used drugs that night. He said that he was not expecting the victim to be at the trailer that night and that he did not know some people believed that the victim was a "snitch." He said the victim did not appear to be scared when he got to the trailer or when the defendant arrived. Bradley said he was in the hallway when the shooting occurred but was able to see everything.

Bradley testified that he lied in his first statement to the police when he told them that the victim was alive when he dragged him outside the trailer. He acknowledged telling the police that Lighter was a "wild man" and was throwing things in the trailer all over the place. He acknowledged telling them in his first statement that there was only one shot, that he was in the bedroom during the shooting, and that he did not know who shot the victim. He said he did not talk to the police immediately after the killing because he was scared. He admitted that the defendant gave them drugs after the killing but denied that that was the reason he remained quiet. He acknowledged having convictions for assault, possession of drug paraphernalia, and burglary. He admitted he did not try to help the victim and did not call 9-1-1. On redirect examination, he testified that he was not honest in his first statement to the police because he was scared of the defendant.

John McClure testified that he had known the defendant for about ten years. He said that before he went to sleep on June 9, 2001, he told Collins and Boivin not to let the victim inside the trailer because he thought there might be trouble. He said that he was asleep when the victim arrived on June 9 and that he did not wake up until he heard the defendant's car in the driveway. He said that after seeing the defendant's car, he heard gunshots. He said he jumped out of a window and ran to his house. He said that after reaching his house, he decided to go to a neighbor's house to call the police.

McClure testified that he met Bradley on his way to the neighbor's house and that they went back to the trailer and loaded the victim's body into the trunk of McClure's car. He said they rolled the body off a bridge and returned to the trailer. He said the defendant later returned to the trailer and asked if the victim's body had been hidden. He said that the defendant told them that if they had not removed the body, the defendant would have killed them. He said the defendant told him that he had shot the victim in the chest and in the back. McClure said he pled guilty to accessory after the fact of first degree murder and was given probation in exchange for his testimony against the defendant.

On cross-examination, McClure testified that he heard six shots before he jumped out of the window in the trailer. He acknowledged that he did not see the defendant that night until after he

had dumped the victim's body over a bridge. He said that in the days after the defendant killed the victim, the defendant gave Collins and Boivin drugs but said he did not take drugs from the defendant. He acknowledged that he knew people believed that the victim was a "snitch." He acknowledged that he did not help the victim and never called the police.

Kristie Collins testified that she used to date and was still friends with George Martindale, the defendant's uncle. She said the victim had stayed at her trailer on several occasions before he was killed. She said that she had asked the victim whether he was a "snitch" and that he had told her that he was not. She said that on June 9, 2001, the victim knocked on her bedroom window and asked to be let inside. She said she acquiesced, got him a blanket, and went back to bed. She said the defendant arrived at the trailer at about 2:30 a.m., asking if the victim was there. She said that the victim responded that he was there and that the defendant began shooting the victim. She said the defendant shot the victim six times before he had to reload his gun. She said the victim begged the defendant not to shoot him anymore and to call 9-1-1. She said the defendant threw a quarter at the victim and told the victim to call 9-1-1 himself. She said she heard one or two more shots when she ran to the back of the trailer to check on her two children. She said the defendant came to the back of the trailer and told her that if she said anything, he would kill her.

Collins testified that the defendant hit Bradley twice with the gun and told him to move the victim's body. She said Lighter hit Bradley with a vacuum cleaner. She said that the defendant again threatened to kill anyone that talked, and she said that she was scared for her children's safety. She said the defendant returned to her trailer each day after the killing to make sure no one had talked about the incident. She said friends of hers burned the couch and rug because they were ruined from the grease being poured on them. She acknowledged that she used crack cocaine that the defendant had given her after the killing. She said she did not call the police because she was scared. She said that she pled guilty to accessory after the fact of first degree murder and that she received probation in exchange for her testimony.

On cross-examination, Collins testified that Wilson used to go to her trailer to buy drugs. She acknowledged frequent drug use at her house at the time of the killing, but she said she did not remember if she or others had used drugs on the night of the killing. She acknowledged that she knew that the victim was suspected of being a "snitch" and that the police were looking for him. She said that there was a rumor that the victim had "snitched" on Tim and Theresa Martindale and that they went to jail because of the victim. She acknowledged that in her statement to the police, she told them that she had warned the victim that "he didn't need to be up there running" when he knocked on her window on June 9, 2001. She denied, however, that she knew the victim was running from anyone. She said that when the defendant came back after Bradley and McClure had removed the victim's body, Wilson asked her if the victim was dead. She said the defendant seemed high that night and was not himself. She said she tried to stop the defendant from killing the victim. She denied that she knew something was going to happen that night and denied that she knew the victim was a "snitch."

-4-

Sammy Holt testified that he was married to Valerie Holt and that they drove trucks for a living. He said the defendant came to their house on June 9, 2001, after he and his wife had returned from a drive. He said that the defendant was with Lighter and that the defendant told Mr. Holt that he was going to kill the victim because the victim had mistreated his family. He said he told the defendant to calm down, go home, and go to bed. On cross-examination, Mr. Holt testified he heard Wilson say that it was going to "go down" three times that night. He said the defendant seemed intoxicated. On redirect examination, Mr. Holt testified that the defendant knew who he and his wife were that night, that he talked slurred but coherently, and that he was able to walk back to the car without any help.

Valerie Holt testified that the defendant, Wilson, and Lighter came to her house on June 9, 2001. She said that when she heard Wilson say someone was going down, she asked Wilson who was going down. She said Wilson responded that it was the victim. On cross-examination, Mrs. Holt testified that the defendant seemed intoxicated but was calm when he left her house.

Dr. Charles Warren Harlan testified that he specialized in forensic pathology and had completed thousands of autopsies. He said he performed an autopsy on the victim and determined that he died of multiple gunshot wounds to the chest and abdomen. He said he found entry wounds in the victim's right shoulder, the back of his hand, his back, and the back of the neck. He said the victim's blood tested negative for alcohol but positive for a small amount of cocaine. On cross-examination, Dr. Harlan testified that he did not find powder burns on the victim, indicating that the victim was not shot from a distance of less than twelve inches. He said he found no bruising caused by a physical struggle.

Mike Chapman, an investigator for the Giles County Sheriff's Department, testified that on June 11, 2001, he interviewed Wilson and Bradley. He said he believed Bradley was being deceptive and interviewed him a second time. He said that based on Bradley's second statement, the police found the victim's body under a bridge and arrested the defendant for the victim's murder. He said the police never found the gun used in the shootings. He said that he was unable to find any policeman using the victim as a "snitch" and that the victim had nothing to do with Tim and Theresa Martindale's case. On cross-examination, Chapman acknowledged that Collins, Bradley, Boivin, and McClure had all made deals with the state in exchange for their testimony against the defendant. He acknowledged that the defendant said in his statements that he was heavily intoxicated on the night of the victim's death and that Wilson was "gassing him up," knowing that he would kill the victim. He said that the defendant told him that Wilson told him where to find the victim on the night of the killing.

Tanya Reed testified that she lived with Tim and Valerie Holt and saw the defendant on June 9 when he came to their house. She said the defendant seemed drunk and drowsy. She said that she did not hear him say he was going to kill anyone but that she was not around the defendant for the entire time he was at their house. She said he was not so intoxicated that he did not know who she was that night.

The defendant gave a statement to the police on June 14, 2001, which was introduced into evidence at trial. In his statement, the defendant said that he was angry at the victim for stealing gas from his late grandfather's car and because the victim had been selling fake drugs using the "Martindale" name. He said he remembered that the victim, Collins, her two children, McClure, and Bradley were in the trailer when he killed the victim. He said Wilson, Lighter, and George Martindale were in the car with him when he went to the trailer to kill the victim. He said he was "messed up" because he had been drinking and had taken five Xanax pills that night.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his first degree premeditated murder conviction because he was too intoxicated to form the requisite intent for premeditation. The state argues that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree premeditated murder is defined as an unlawful, "premeditated and intentional killing of another." T.C.A. §§ 39-13-201, -202(a)(1). Premeditation is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

In order for the defendant to rely upon voluntary intoxication as a defense, "there must be evidence that the intoxication deprived [him] of the mental capacity to form specific intent. . . . The determinative question is not whether [he] was intoxicated, but what was his mental capacity." Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979). In this regard, whether the defendant was too intoxicated to form the requisite intent is for the jury to determine. State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985).

Viewed in the light most favorable to the state, we believe that the evidence is sufficient to support the defendant's conviction. Sammy Holt testified that the defendant was at his house on June 9, 2001, and told him that he was going to kill the victim. He testified that although he could tell the defendant was intoxicated, the defendant knew to whom who he was talking, was able to talk coherently, and walked to his car unaided. Holt testified that the defendant was calm when he left his house. David Bradley and Kristie Collins testified that when the defendant arrived at the trailer, he asked where the victim was and then began shooting the victim. Bradley said the defendant reloaded his gun three times and fixed his gun when it fell apart. Bradley said the defendant shot the victim once outside the trailer, stating he wanted to make sure the victim was dead. Bradley and Collins said that after shooting the victim multiple times, the defendant warned them not to tell anyone or he would kill them too. They said the defendant instructed Bradley to dispose of the body. They said the defendant left and then returned thirty minutes later to make sure Bradley had disposed of the victim's body.

In the defendant's statement to the police, he said he killed the victim because he had stolen gas from his late grandfather and because the victim was selling fake drugs using the "Martindale" name. The defendant remembered who was in the trailer and who rode to the trailer with him that night. The evidence shows that the defendant believed that the victim had wronged him and his family and that the defendant deliberately went to the trailer to kill the victim. The evidence presented at trial supports the defendant's conviction for premeditated first degree murder.

## II. FAILURE TO EXCLUDE AUTOPSY EVIDENCE

The defendant complains about the state's delayed disclosure of the autopsy report and argues that evidence resulting from the report should have been excluded. Dr. Charles Harlan performed an autopsy on the victim's body on June 15, 2001. He testified at trial that the victim died of multiple gunshot wounds to the chest and abdomen, that there were no powder burns on the body, and that the autopsy revealed a small amount of cocaine in the victim's body. The defendant first requested Dr. Harlan's autopsy report on October 29, 2001. On May 24, 2002, the defendant again requested that the state provide the defense with the report. On June 6, 2002, the trial court instructed the state to provide the report for the defendant. On June 7 and June 11, 2002, the state informed the defense that they had been unable to get the autopsy report from Dr. Harlan. On Thursday, June 12, 2002, five days before trial, the state sent the autopsy report to the defendant.

At a hearing on June 13, 2002, the defense claimed it had not had sufficient time to review the autopsy report and asked the trial court to exclude it from the evidence pursuant to Tenn. R.

Crim. P. 16(d)(2). The state argued that there were no surprises revealed in the autopsy report and that any problems from the delay could be remedied with a continuance. The trial court found that the state lacked diligence in its efforts to provide the defendant with the autopsy report but stated that the defendant had failed to show any prejudice resulting from the delay. The trial court stated that the defense could interview Dr. Harlan on the weekend before trial and rejected the defendant's request that the autopsy evidence be excluded. The trial began on Monday, June 17, 2002.

The defendant claims that the trial court erred by refusing to exclude evidence derived from the autopsy. He argues that the trial court's failing to exclude the evidence was reversible error because the defense did not have sufficient time to develop theories based on the results of the report. He claims that he did not request a continuance because he did not want the defendant's right to a speedy trial to be violated. The state claims the trial court properly refused to exclude the evidence because the court gave the defendant the opportunity to interview Dr. Harlan the weekend before trial and because the defendant could have asked for a continuance to remedy any problem from the delay. Moreover, the state notes that the defendant did, in fact, question Dr. Harlan on a discrepancy between the autopsy result and David Bradley's testimony, which the state believes indicates that the defendant had sufficient time to review the report.

If a party fails to comply with a discovery request, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). Whether a defendant has been prejudiced by the state's failure to disclose information is a significant factor in determining an appropriate remedy. State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). Exclusion of evidence is a "drastic remedy and should not be implemented unless there is no other reasonable alternative." Id. When arguing that the state violated Rule 16, the defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992).

At the hearing on June 12, 2002, the defendant emphasized that he did not want a continuance. The defendant claims he should not have been forced to choose between his right to a speedy trial and his discovery rights under the Tennessee Rules of Criminal Procedure. The defendant's trial began slightly over a year after he was charged with the offense. After reviewing the record, we conclude that a continuance of a few days to allow the defendant more time to review the autopsy report would not have violated the defendant's right to a speedy trial. See Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972). The defendant's claim that a continuance to further examine the autopsy report would have violated his right to a speedy trial is without merit.

In any event, the defendant was not prejudiced by the delay in acquiring the report. There was never any question that the victim died of multiple gunshot wounds and the time of death was not at issue in this case. The defendant questioned Dr. Harlan at trial about the significance of the lack of gunpowder burns on the victim's body. The doctor responded that it meant that the victim had not been shot from twelve inches or less. At trial, defense counsel pointed out that this

-8-

conflicted with David Bradley's testimony that the defendant held the gun to the back of the victim's neck and shot twice. The defendant mentions the cocaine in the victim's body but fails to connect that to any possible helpfulness in the case. In addition, the defendant does not assert how talking with Dr. Harlan the weekend before the defendant's trial was an insufficient alternative to the exclusion of the autopsy evidence. The trial court was reasonable in its ruling to allow the defense to interview Dr. Harlan over the weekend before trial rather than employing the drastic remedy of excluding evidence.

## III. SENTENCING INSTRUCTIONS

The defendant contends that the sentencing instructions to the jury were unclear on the proper standard for it to use in determining whether to give the defendant life in prison without the possibility of parole or life in prison. He claims that the instruction seems to require a jury to impose life in prison without the possibility of parole if they find that an aggravating factor is present. The state responds that the sentencing instructions given to the jury were proper.

In the trial court's instruction to the jury on how to reach a sentence for the defendant, it stated verbatim the language in the Tennessee Criminal Pattern Jury Instructions. The court instructed the jury as follows:

> In arriving at this determination, you are authorized to weigh and consider any of the statutory aggravating circumstances proved, beyond a reasonable doubt, and any mitigating circumstances which may have been raised by the evidence throughout the entire course of this trial, including the guilt finding phase or sentencing phase, or both.
>
> . . . .
>
> Tennessee law provides that no sentence of imprisonment for life without possibility of parole shall be imposed by a jury, but upon a unanimous finding that the State has proven, beyond a reasonable doubt, the existence of one or more of the statutory aggravating circumstances . . . .
>
> . . . .
>
> If you unanimously determine that a statutory aggravating circumstance or circumstances have been proved by the State, beyond a reasonable doubt, you shall in your considered discretion sentence the defendant either to imprisonment for life without possibility of parole, or to imprisonment for life.

The jury returned a sentence of life in prison without the possibility of parole, finding the aggravating factors that the defendant knowingly created a great risk of death to two or more people other than the victim during the murder and that the murder was especially heinous, atrocious, or cruel because it involved torture or serious physical abuse beyond that necessary to cause the victim's death. See T.C.A. § 39-13-204(i)(3), (5).

In a noncapital first degree murder case, when "the jury unanimously determines that the state has proven beyond a reasonable doubt one (1) or more of the statutory aggravating circumstances . . . the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or imprisonment for life." T.C.A. § 39-13-207(c). In reviewing the sentence on appeal, pursuant to T.C.A. § 39-13-207(g), this court must use the following standard of review:

> When a defendant has been sentenced to imprisonment for life without possibility of parole, such defendant may appeal such sentence to the Tennessee court of criminal appeals. The court of criminal appeals shall first consider any errors assigned and then the court shall review the appropriateness of the sentence. A sentence of imprisonment for life without possibility of parole shall be considered appropriate if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of . . . discretion.

In claiming the instructions were unclear, the defendant relies on footnote 10 in State v. Harris, 989 S.W.2d 307, 317 (Tenn. 1999), in which the supreme court suggested that the legislature clarify T.C.A. § 39-13-204(f)(2) because it was vague regarding the proper standard for a jury's decision to impose either life in prison or life in prison without the possibility of parole. 989 S.W.2d at 317 n.10. The footnote states:

> We observe, however, that the statutory scheme with regard to the manner of sentencing and appellate review in life without parole cases needs further clarification by the Legislature. As we have discussed, Tenn. Code Ann. § 39-13-204(f)(2) allows a jury to impose a sentence of either life or life without parole upon a finding of at least one aggravating circumstance. There are no required findings or standards for choosing one sentence or the other. Thus, in any case where at least one valid aggravating circumstance has been found, there are few practical means by which an appellate court can determine whether a sentence of life without parole was a 'gross abuse' of the jury's discretion under § 207(g).

Id. The state notes that this suggestion was made for appellate review purposes and that the supreme court did not view the jury process and the statute to be improper. We believe the state to be correct.

In any event, a review of the trial court's sentencing instruction to the jury shows that the instruction was proper. The instruction clarified that if the jury found an aggravating factor, it could, in its discretion, sentence the defendant to either life in prison or life in prison without the possibility of parole. This instruction did not, as the defendant suggests, require the jury to impose life in prison without the possibility of parole upon the finding of an aggravating factor. The trial court properly instructed the jury regarding sentencing.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE