## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT KNOXVILLE

### APRIL 1999 SESSION

**FILED**

September 27, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | * | No. 03C01-9808-CR-00272 |
| **Appellee** | * | HAMILTON COUNTY |
| **V.** | * | Hon. Stephen M. Bevil, Judge |
| **JAMES LEE CANNON** | * | (First Degree Murder) |
| **Appellant.** | * | |

For Appellant

Donna Robinson Miller
Assistant District Public Defender
701 Cherry Street, Suite 300
Chattanooga, Tennessee 37402

For Appellee

John Knox Walkup
Attorney General and Reporter
425 Fifth Avenue North
Nashville, TN 37243-0493

Erik W. Daab
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

Barry A. Steelman
Assistant District Attorney General
600 Market Street
Chattanooga, TN 37402

OPINION FILED:

AFFIRMED

NORMA MCGEE OGLE, JUDGE

**OPINION**

The appellant, James Lee Cannon, appeals his sentence of imprisonment for life without possibility of parole imposed by a jury in the Hamilton County Criminal Court on October 15, 1997. The appellant contends that (1) the jury failed to comply with Tenn. Code. Ann. § 39-13-207(e) (1997); and (2) the jury's imposition of the challenged sentence was arbitrary and constituted a gross abuse of its "considered discretion." Tenn. Code. Ann. § 39-13-207(c), (g). Based upon our review of the record, we affirm the judgment of the trial court.

**Factual Background**

On November 1, 1995, a Hamilton County Grand Jury indicted the appellant for the first degree murder of Tonya Morris. On May 16, 1996, the State filed a "Notice of Intent to Seek the Death Penalty," relying upon the appellant's previous conviction of attempt to commit second degree murder. Tenn. Code. Ann. § 39-13-204(i)(2) (1995). Shortly before the scheduled trial date, on October 2, 1997, the appellant pled guilty to first degree murder upon the understanding that a jury would determine whether he would receive a sentence of imprisonment for life or imprisonment for life without possibility of parole. In accordance with the plea agreement, the trial court conducted a sentencing hearing on October 13 through October 15, 1997.

At the sentencing hearing, the State's proof established that the victim, Tonya Morris, was twenty-six years old at the time of her death and had six children under the age of twelve years. Prior to the murder, the appellant was attempting to initiate a relationship with Ms. Morris. However, according to Dorothy Ann Morris, Tonya Morris' sister, the victim feared the appellant and, on one occasion, left Chattanooga and lived in Cincinnati, Ohio for one year in order to escape the

2

appellant.  She returned from Cincinnati several months before the murder, whereupon the appellant began to stalk her and, on several occasions, threatened her life.

Erica Batts, the victim's cousin, recounted that several days before the murder Ms. Morris telephoned her and asked that she immediately come to an aunt's home.  When Ms. Batts arrived, she observed the appellant standing outside the aunt's home with a butcher knife, calling to the victim to come outside.  The appellant fled upon Ms. Batts' arrival.

Annette Morris, another sister of the victim, recounted that on the evening prior to the murder the appellant called her home, where the victim was temporarily residing.  When Ms. Morris informed the appellant that the victim was not at home, the appellant responded, "You better have some damn death insurance out on her because she's going to die."

On the day of the murder, the victim asked her brother, Lovest Morris, and his fiancé to drive her to the food stamp office at the Eastside Community Center in Chattanooga.  While Ms. Morris was inside the office, the appellant appeared and asked Mr. Morris where he could find the victim.  When Mr. Morris indicated that his sister was inside the food stamp office, the appellant entered the Community Center building and quickly reemerged with Ms. Morris.  While they were conversing in the parking lot, the appellant withdrew a "nine-shot revolver" and fired the weapon at the victim several times.  When the victim collapsed onto the ground, the appellant stood over the victim and shot her two times in the back of the head at close range.  Dr. Frank King, the Hamilton County Medical Examiner, testified that Ms. Morris was shot a total amount of six or eight times.

After shooting Ms. Morris, the appellant walked calmly away. Shortly thereafter, Robert Ford, a security guard for the Department of Human Services, was notified of the shooting and left the food stamp office to investigate. In the parking lot, several witnesses indicated to the officer the direction in which the appellant had fled. Officer Ford pursued the appellant, locating him three blocks away from the scene of the murder. When he approached the appellant, the appellant immediately surrendered.

The appellant declined to testify at the sentencing hearing. However, Brenda Fuller, a friend of the appellant, presented an entirely different account of the appellant's relationship with Ms. Morris. She testified that Ms. Morris was a prostitute who had been addicted to illegal drugs. According to Ms. Fuller, the appellant attempted to help Ms. Morris by providing money to her and by assisting her in the care of her children. Ms. Fuller asserted that the appellant encouraged the victim to abandon prostitution and stay at home with her children. Ms. Fuller remarked that the appellant "even" bought Ms. Morris drugs in order to encourage her to remain at home with her children. She stated that the appellant always treated his girlfriends well, including Ms. Morris. However, Ms. Morris "was always just messing off, taking his money and using drugs and using another man . . . ." She concluded:

> [R]ight, this girl is dead, and it's wrong . . . but . . . I'm also looking at her lifestyle and what she did. Pig[1] is just the one that ended up killing her . . . .

The appellant's proof further established that he was born on March 2, 1948, in Moundville, Alabama, and was one of five children. His father was a sharecropper on a small farm. The appellant was born at home, with a midwife in

---

[1]"Pig" is the appellant's nickname.

attendance. His mother was in labor for three days, and, when the appellant was born, he fell on the floor, striking his head. Family members noted that the appellant was a quiet, somewhat unhealthy child, but was never taken to a doctor.

When the appellant was thirteen years of age, his father died, and the family moved to Chattanooga where they lived in poverty. The appellant maintained a poor academic record, attending high school through the eleventh grade. The appellant apparently did not engage in criminal activity until the age of seventeen when he participated in the burglary of a local laundry establishment.

In 1971, at the age of twenty-three, the appellant attempted to enlist in the United States Marine Corps. He was discharged prior to completing his training due to "mental inaptitude" and "limited ability precluding successful completion of recruit training." The reviewing officer reported:

> [The appellant] possess[es] a bel[l]igerent disrespectful attitude which is complicated by the fact he won't do anything that requires a little bit of effort on his part. . . . He was sent to conditioning platoon where he was transferred to Motivation Platoon after demonstrating that he has the ability if he will only attempt to use it. . . . "Mental ability is limited as probably is physical ability. Doubt if he has the assets to make it."

The appellant later enlisted in the United States Army, from which he was also discharged for "failure to meet acceptable standards for continued military service," including being absent without leave on several occasions. The appellant was subsequently employed by various businesses in Chattanooga, including Hunt's Food Market, Cox & Moore Furniture, "Idex" Upholstery, and Wheland Foundry.

Several family members testified concerning the appellant's past generosity, including providing food, clothing, and care to his niece and nephew, and assistance to his alcoholic sister-in-law. Friends of the appellant also testified

5

concerning the appellant's past acts of kindness, including providing financial assistance to friends, visiting sick friends, and babysitting their children.

In 1990, the appellant was convicted in the Hamilton County Criminal Court of attempt to commit second degree murder. Upon his entry into the Tennessee Department of Correction, the appellant underwent a psychological evaluation. Clorinda Smithson, a licensed psychological examiner for the Department of Correction, testified that she interviewed the appellant during the course of his evaluation. Ms. Smithson reported that the appellant appeared to "admit responsibility" for his offense, recounting to Ms. Smithson the circumstances of the offense: "Me and my old lady got into it. I stabbed her 17 times."[2] Ms. Smithson further observed that the appellant was cooperative during the interview, his "[a]ffect [was] appropriate; mood and thought processes appear[ed] appropriate."

The Department also administered several tests to the appellant, including the "Beta, revised" ("a group test of general intelligence"), the Wide Range Achievement Test, the Peabody Picture Vocabulary Test, and the Carlson Psychological Survey. On the group intelligence test, the appellant achieved a full scale I.Q. of 60, placing the appellant in the mildly mentally retarded range of intellectual functioning. However, Ms. Smithson conceded during the sentencing hearing that subsequent testing performed by a Dr. Eric Engum, which indicated a higher I.Q., was probably a more accurate reflection of the appellant's intelligence. On the Wide Range Achievement test, the appellant demonstrated reading skills at

---

[2]Generally, in a sentencing hearing, "it is not appropriate to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the conviction on its face shows that it involved violence or the threat of violence to the person." State v. Bigbee, 885 S.W.2d 797, 811 (Tenn. 1994). However, in this case, defense counsel introduced the evidence concerning the specific facts underlying the appellant's conviction of attempt to commit second degree murder.

6

a fifth grade level, spelling skills at a third grade level, and knowledge of arithmetic at a fifth grade level. On the Peabody Picture Vocabulary test, the appellant "achieved an age equivalent of ten years and four months." Finally, the Carlson Psychological Survey produced the following conclusions:

> This type presents himself as the victim of circumstances rather than the offender. He rationalizes the offense and denies any guilt for it with an excuse ready for each crime committed. They are self-centered and do not listen to criticism or advice. Their judgment is faulty and so is their impulse control, making them easy targets for manipulative peers. Feelings of insecurity, lack of identity, emotional immaturity and dependence are also characteristic of this type. There is little insight, no ambition toward future goals, and they are polite, cooperative and sometimes shy and quiet. Many of this type have difficulties in understanding and directing their sexual desire. . . .

Dr. Eric Engum, a clinical psychologist specializing in clinical neuropsychology and forensic psychology, also testified on behalf of the appellant. He interviewed the appellant in the Hamilton County Jail on two occasions following Ms. Morris' murder, for a total amount of twelve or fourteen hours. Dr. Engum administered several tests during the interviews, including the Wechsler Adult Intelligence Scale-Revised, a neuropsychological examination, the Carlson Psychological Survey, and the Minnesota Multiphasic Personality Inventory-Revised. Dr. Engum determined that the appellant possesses an I.Q. of 82, placing him in the borderline range of intellectual functioning. Dr. Engum conceded that the appellant is not retarded.

Moreover, Dr. Engum concluded that the appellant is not insane, i.e., he does not suffer from a mental disease or defect which impairs his ability to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law. However, Dr. Engum diagnosed the appellant with several

mental diseases or defects, including cyclothymic disorder, either an organic

personality disorder or a schizoid personality disorder, and a cognitive disorder. Dr.

Engum opined that the appellant's level of intellectual functioning and his other

mental defects substantially affected his judgment at the time of the murder.

Moreover, according to Dr. Engum, the appellant was under the influence of

extreme mental or emotional distress at the time of the murder, precluding his ability

to premeditate the murder. Dr. Engum explained:

> Recognize that what the test results are showing are first
> somebody with limited intellectual ability, okay? An IQ of
> 82. . . .
>
> Second, you have somebody whose, what I call adaptive
> skills or problem solving skills are quite limited. This is
> an individual who works in a very structured and
> sequential fashion, he doesn't understand all of
> complexities of interpersonal interaction.
>
> Third, you have somebody who is socially inept, not real
> sophisticated, he has some paranoid tendencies, he has
> a strong tendency to misperceive what other people's
> intentions are towards him.
>
> Fourth, he is somebody who -- he internalizes and
> represses a lot of his feelings and emotions, and it's
> pretty much like a pressure cooker, and he will almost
> deny that other people are abusing him or misusing him,
> and then it finally gets to the point of where he's just
> overwhelmed by it and will explode . . . . Most of the time
> he is pretty much docile, depressed, dysphoric,
> withdrawn, but when the pressure build up, that is when
> he can act out in a manner that he did towards Ms.
> Morris.

Dr. Engum conceded that his conclusion that the appellant was

experiencing an explosion of suppressed emotions at the time of the murder was

based upon the appellant's account of the murder. The appellant informed Dr.

Engum that, on the day of the murder, he was searching for Ms. Morris in order to

collect money he had loaned to her. He denied to Dr. Engum that he intended to

harm the victim but admitted that he intended to threaten her. When the appellant

8

located Ms. Morris, "the situation escalate[d] and he started shooting. Again, he reached that boiling point, exploded, and unfortunately with lethal consequences."

Dr. Engum qualified his testimony, remarking that, if the appellant had previously threatened to kill Ms. Morris, this fact might change his opinion concerning the degree of the appellant's mental or emotional distress. Nevertheless, Dr. Engum maintained that evidence of prior threats would not necessarily preclude his "pressure cooker" theory. Dr. Engum concluded that, in the future, the appellant "might present a risk to [any] individual who betrays his trust."

## Analysis

### I. Imprisonment for Life Without Possibility of Parole

#### a. Sentencing Procedure

Tenn. Code. Ann. § 39-13-207 delineates the sentencing procedure in cases of first degree murder when the State declines to seek the death penalty. Following a defendant's conviction of first degree murder, the trial court conducts a separate sentencing hearing during which a jury determines whether the defendant should be sentenced to life or life without parole. Tenn. Code. Ann. § 39-13-207(a). As in the case of capital proceedings, "evidence may be presented as to any matter that the court deems relevant to the punishment . . . ." Tenn. Code. Ann. § 39-13-204(c); Tenn. Code. Ann. § 39-13-207(a). This evidence may pertain to "the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances . . . ; and any evidence tending to establish or rebut any mitigating factors." Tenn. Code. Ann. § 39-13-204(c). Statutory aggravating and mitigating circumstances are set forth in Tenn. Code. Ann. § 39-13-204(i) and (j).

9

In sentencing a defendant, the jury must first determine whether the State has proven at least one statutory aggravating circumstance beyond a reasonable doubt. Tenn. Code. Ann. § 39-13-207 (b), (c). Only if the jury unanimously finds a statutory aggravating circumstance beyond a reasonable doubt may the jury consider, in its discretion, the imposition of a sentence of life without parole. Id. In order to impose the harsher penalty, the jury need not find that the statutory aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, but must simply weigh and consider aggravating and mitigating circumstances. Id. at (d).[3]

Following the presentation of the proof in this case, the trial court instructed the jury on the aggravating circumstance set forth in Tenn. Code. Ann. § 39-13-204(i)(2), the appellant's prior conviction of a felony whose statutory elements involve the use of violence to the person. The trial court also instructed the jury on the following mitigating circumstances:

> Number 1, The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. [See Tenn. Code. Ann. § 39-13-204(j)(2)].
>
> Number 2, The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect, which was insufficient to establish a defense to the crime, but which substantially affected his judgment. [See Tenn. Code. Ann. § 39-13-204(j)(8)].
>
> Number 3, The defendant's family, personal and professional relationships and any effect these

___

[3]We do note that the trial court in its general instructions erroneously directed the jurors to consider whether the aggravating circumstance in this case outweighed any mitigating circumstances beyond a reasonable doubt. Nevertheless, despite the trial court's improper instruction, "[r]equiring the jury to make such a determination held the state to a higher burden than our legislature dictates and thus, provided a heightened protection for the appellant." State v. Lee, No. 02C01-9603-CC-00085, 1997 WL 686258, at *10 (Tenn. Crim. App. at Jackson, November 5, 1997), perm. to appeal denied, (Tenn. 1998). Accordingly, we conclude that any error was harmless beyond a reasonable doubt.

relationships may have had upon him.

Number 4, The defendant's family, military and personal background, including any history of emotional disturbance, familial instability or childhood problems.

Number 5, The defendant's mental, emotional and psychological history and any impact this may have had on the defendant.

Number 6, The defendant's conduct when arrested and since the offense, any evidence of the defendant's regret or remorse, and any evidence of the defendant's acceptance of responsibility for the offense and/or any cooperation with the authorities.

Number 7, The defendant's self-perception and its effect on him.

Number 8, The defendant's positive personal relationships and history with family members and other individuals.

Number 9, The defendant's history of good character.

Number 10, The defendant's potential for treatment in prison.

Number 11, The defendant's advanced age at the time of his first eligibility for parole.

[Number 12,] Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at the sentencing hearing . . . . [See Tenn. Code. Ann. § 39-13-204(j)(9)].

Additionally, in accordance with the appellant's request under Tenn. Code. Ann. § 40-35-201(b) (Repealed May 18, 1998), the trial court informed the jury that, if it chose to impose a sentence of life instead of life without parole, the appellant would be eligible for parole after serving at least fifty-one years in the Department of Correction. As previously noted, the jury imposed a sentence of life without parole.

### b. The Jury's Compliance with Tenn. Code. Ann. § 39-13-207(e)

When a criminal defendant appeals a sentence of life without parole, this court must first consider any errors assigned and then review the propriety of

11

the sentence. Tenn. Code. Ann. § 39-13-207(g). The appellant assigns as error the jury's failure to comply with Tenn. Code. Ann. § 39-13-207(e), which requires the jury to return its verdict upon a form reflecting the jury's unanimous finding of at least one statutory aggravating circumstance beyond a reasonable doubt.

Following its deliberation in this case, the jury announced that it had unanimously sentenced the appellant to life without parole. Immediately thereafter, the trial court and the jury foreperson engaged in the following colloquy:

| | |
|---|---|
| Court: | And did the jury find a statutory aggravating circumstance, and, if so, is that listed on the documents? |
| Jury Foreperson: | There is nothing listed there. |
| The Court: | All right. Members of the Jury, I'm going to ask you to step back into the jury room and reread the portion of the charge that says, Punishment of Imprisonment For Life Without Possibility of Parole or Imprisonment For Life. |
| | We, the jury unanimously find the State has proven the following listed statutory aggravating circumstance beyond a reasonable doubt. (Here list the statutory aggravating circumstance so found.) |
| | Tennessee law provides that no sentence of imprisonment for life without possibility of parole shall be imposed by a jury, but upon a unanimous finding that the State has proven beyond a reasonable doubt the existence of the following aggravating circumstance: |
| | The defendant was previously convicted of a felony, other than the present charge, whose statutory elements involve the use of violence. The State is relying upon the crime of Attempt to Commit Second Degree Murder, as a felony involving the use of violence to the person. |
| | Members of the Jury, the Court has read to you the statutory aggravating circumstance, which the law requires you to consider if you find beyond a reasonable doubt that the evidence was established. You shall |

> not take into account any other facts or
> circumstances as the basis for deciding
> whether imprisonment for life without
> possibility of parole would be appropriate
> punishment in this case.
>
> If you will, at this time, please, step back
> into the jury room and complete the verdict
> form.

When the jury returned to the courtroom once more, the verdict form reflected the jury's unanimous finding of the requisite aggravating circumstance. The trial court polled the jurors to confirm their unanimity with respect to both the aggravating circumstance and the sentence of life without parole.

"[W]hen a jury returns an incorrect or imperfect verdict, the trial court has both the power and the duty to send them back to the jury room with directions to amend the verdict to put it in the proper form." State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994). See also State v. Harris, 989 S.W.2d 307, 314 n.7 (Tenn. 1999); State v. Nichols, 877 S.W.2d 722, 730 (Tenn. 1994). In State v. Jefferson, 938 S.W.2d 1, 22 (Tenn. Crim. App. 1996), this court articulated the appropriate procedure to be applied by a trial court when a jury returns an incorrect or imperfect verdict:

> The trial court should advise the jury that the court
> cannot accept the verdict, direct the jury to either reread
> the charge given by the court or the court can give a
> supplemental charge, and have the jury retire to consider
> its verdict.

The trial court in this case complied with this procedure and properly accepted the resultant verdict of the jury.

Nevertheless, the appellant argues that, because the trial court failed to ascertain whether the jurors had unanimously found the requisite aggravating circumstance *before* asking the jurors to return to the jury room and correct the

verdict form, the record does not reflect whether the jury found the aggravating circumstance beyond a reasonable doubt. In other words, the appellant posits that the jury, in amending the verdict form, may have simply "complet[ed] the form as the Court had ordered them to complete it."

However, the appellant's argument completely ignores the trial court's explicit supplemental instruction that, in order to impose a sentence of life without parole, the jury was required to find the aggravating circumstance beyond a reasonable doubt. Moreover, the appellant's argument ignores the trial court's polling of the jury, following the amendment of the verdict form, to ensure that the jurors had found the aggravating circumstance beyond a reasonable doubt. This issue is without merit.

### c. The Propriety of the Sentence

With respect to the propriety of the appellant's sentence, Tenn. Code. Ann. § 39-13-207(g) provides:

> A sentence of imprisonment for life without possibility of parole shall be considered appropriate if the state proved beyond a reasonable doubt at least one (1) aggravating circumstance contained in Tenn. Code. Ann. § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion.

The appellant does not contest that the State proved beyond a reasonable doubt the aggravating circumstance that the appellant was previously convicted of a felony whose statutory elements involve the use of violence to the person. Tenn. Code. Ann. § 39-13-204(i)(2). In fact, the parties stipulated the appellant's prior conviction of attempt to commit second degree murder. Additionally, the Tennessee Supreme Court has previously held that the crime of attempt to commit second degree murder is a crime whose statutory elements involve the use of violence within the meaning

of Tenn. Code. Ann. § 39-13-204(i)(2).  <u>State v. Cribbs</u>, 967 S.W.2d 773, 782-83 (Tenn. 1998).  However, the appellant argues that, in light of the numerous mitigating circumstances, the jury's imposition of a sentence of life without parole was arbitrary and constituted a gross abuse of discretion.  We disagree.

Initially, in reviewing the jury's imposition of a sentence of life without parole, neither this court nor the appellant may resolve questions concerning the credibility of witnesses, the weight and value to be accorded the evidence, or factual issues raised by the evidence.  <u>State v. Collier</u>, 03C01-9602-CR-00072, 1997 WL 9722, at *7 (Tenn. Crim. App. at Knoxville, March 4, 1997).  Rather, the jury as the trier of fact was entitled to assign to each aggravating or mitigating circumstance whatever weight it deemed appropriate.  <u>Id.</u>  Keeping this principle in mind, we conclude that the record in this case amply supports the jury's verdict.

In reaching this conclusion, we note generally that the evidence introduced by the appellant in mitigation was not uniformly helpful to the appellant. Moreover, although the record reflects the appellant's borderline range of intellectual functioning and various mental defects, Dr. Engum confirmed that the appellant is neither retarded nor insane.  Also, the record does not otherwise support Dr. Engum's conclusion that the appellant committed the instant offense due to a sudden explosion of suppressed emotions.  Rather, the evidence suggests that, due to the victim's rejection of the appellant, the appellant had been stalking her for some time and planned to kill her.  Indeed, even the appellant's version of events supplied an additional motive for the murder: the victim's failure to repay a loan by the appellant.  On the morning of the murder, the appellant was searching for the victim, carrying a fully loaded revolver.  When the appellant located the victim, after

15

briefly conversing with her, he unloaded his revolver into the victim and calmly walked away. Finally, even if the appellant's judgment was impaired at the time of the murder, we cannot say that the jury erred in according more weight to the appellant's previous lapse in judgment when he stabbed a former girlfriend seventeen times.

Similarly, we agree with the State that the appellant's prior conviction and the circumstances of the instant offense significantly undercut the testimony by the appellant's relatives and friends concerning the appellant's good character as well as other mitigating circumstances arguably raised by the evidence. Furthermore, Dr. Engum testified that the appellant was likely to commit violent acts in the future. See, e.g., State v. Bogus, No. 02C01-9506-CC-00169, 1998 WL 22031, at *7 (Tenn. Crim. App. at Jackson), perm. to appeal denied, (Tenn. 1998)(because the jury could have reasonably believed that the defendant would not conform to society's laws, this court could not conclude that the jury abused its discretion in imposing a sentence of life without parole). This issue is without merit.

## Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
Norma McGee Ogle, Judge


_____
Jerry L. Smith, Judge



_____
Joe G. Riley, Judge

16