IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 8, 2003 Session

**STATE OF TENNESSEE v. ANGALEE LOVE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 96-09431     J. C. McLin, Judge**

---

**No. W2002-03063-CCA-R3-CD  - Filed November 26, 2003**

---

The defendant was convicted of aggravated child abuse of her seventeen-month-old daughter. The defendant contends on appeal that the evidence was insufficient to support the conviction, and the trial court erred in allowing testimony by Dr. Lazar concerning the effects of acetone. We conclude that the evidence presented was sufficient to support the conviction, and any error in admitting the testimony of Dr. Lazar concerning the effects of acetone was harmless. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

William D. Massey and C. Michael Robbins (on appeal), and Coleman Garrett and Michelle Botseri (at trial), Memphis, Tennessee, for the appellant, Angalee Love.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Angalee Love, was convicted of aggravated child abuse (Class A felony) of her seventeen-month-old daughter. She was sentenced as a standard offender to the presumptive sentence of twenty years in the Tennessee Department of Correction. This appeal timely followed. The defendant contends on appeal that the evidence was insufficient to support the conviction, and the trial court erred in allowing testimony by Dr. Lazar concerning the effects of acetone. The judgment of the trial court is affirmed.

**Facts**

Dr. Linda Lazar, a pediatric gastroenterologist, first saw the victim in this case, Bianca Cage, in January of 1995, when the victim was ten months old. The victim was having problems "spitting up." She was prescribed medication, but the problem persisted. Shortly thereafter, the victim had an endoscopy performed, which is a procedure by which a flexible tube with a lens attached is placed down the esophagus and into the stomach to allow a doctor to look for ulcers or anything else which would explain the vomiting. However, nothing was found. She also had a biopsy of her esophagus, which came back normal. Later, the victim was hospitalized for an extended period of time with vomiting and diarrhea. She would not tolerate oral feedings, so a feeding tube, known as a G-tube, was surgically implanted into the victim's stomach. This tube allowed her to be fed directly into her stomach by the use of a special syringe. She also underwent surgery to prevent her from vomiting. The doctor saw the victim again in April of 1995, and she continued to have problems with feeding.

The victim was readmitted to the hospital in September of 1995. At that time, she had evidence of "bubbles of air" in the wall of her stomach and in the blood vessels of her liver. The victim was "extremely ill" and was placed in the intensive care unit for several days, where she was under constant observation. The physicians were concerned that she might have a severe gastrointestinal infection. Tests ran on the victim came back negative for infection.

Dr. Lazar saw the victim again a few days later after she had been moved to a regular room. The victim was unresponsive, and she appeared limp. Her eyes were open, but they were deviated to the right and were unresponsive. Her teeth were clinched, and her stomach "looked firm." Dr. Lazar drained the "blood-tinged" stomach contents through the tube. Dr. Lazar was concerned that the victim might be having a seizure, so she referred her to Dr. Douglas Rose, a pediatric neurologist. The victim was returned to the intensive care unit and was given seizure medication.

After spending a few days in intensive care, the victim returned to normal and was again placed in a regular room. The next day, she again had a seizure-like episode. Dr. Lazar observed that the victim was limp, her teeth were clinched, and she was not responding to stimuli. The victim's stomach appeared to be distended. Dr. Lazar removed the stomach contents. The stomach contents had a "funny smell," like acetone or fingernail polish remover. Dr. Lazar sent the stomach contents to the lab for testing, which revealed the presence of acetone. A blood-acetone test was also performed, which revealed a blood-acetone ratio of 1:32. According to Dr. Lazar, acetone should not normally be present in the bloodstream. Acetone is sometimes present when a person has diabetes under poor control or a metabolism problem. However, the victim did not have diabetes or any metabolism problem. Dr. Lazar testified that she was not an expert on the effects of acetone on the body. However, she researched the symptoms of acetone ingestion and discovered that it can cause a "seizure-like looking appearance." Dr. Lazar felt that, in her medical opinion, acetone could have caused the victim's symptoms.

The victim was transferred back to the intensive care unit. Her condition improved, and her acetone level dropped. On September 13, she was placed in a seizure monitoring room, which was

under constant video surveillance. The doctors were unable to determine the cause of the seizures and felt that video monitoring might help them understand how the seizures started and progressed. Dr. Rose explained that the hospital has two seizure monitoring rooms with a control room between them. There are two video cameras in each monitoring room, which show what is occurring in the rooms on a screen in the control room. The video screen also depicts the EEG. The cameras record continuously and are capable of recording in very low light. There is a marker button in the monitoring room, which the parent is instructed to press when an event occurs, to place a time mark on the videotape. Additionally, there is a technologist in the control room who watches for changes in the patient and can switch between cameras.

Dr. Rose testified that when he explains the monitoring process to the parents, he usually does not explain that the cameras will still function even when the lights are turned off. The victim was moved to the monitoring room on September 13, at approximately 2:00 in the afternoon. Approximately two hours after the victim was moved to the monitoring room, Dr. Rose checked in on the victim, who appeared to be doing fine. After leaving the victim's room, he went into the control room, where the technologist and a nurse were monitoring the situation. The technologist noticed that the defendant turned off the lights in the room and appeared to be doing something to the victim. He directed Dr. Rose's attention to the monitor. The technologist switched to the close-up view to get a better look. The defendant opened the cap to the feeding tube and inserted a syringe filled with some type of liquid. She emptied the contents of the syringe into the feeding tube and walked away. The defendant looked towards the door several times while injecting the victim. She returned a few moments later and injected another full syringe of liquid into the infant. Seconds later, the victim's condition changed. The victim turned suddenly to the right and drew up her legs. The movement did not look normal to the doctor. The defendant then pushed the marker button. Dr. Rose was concerned about what had just transpired and entered the room.

Dr. Rose asked the defendant several times if the victim had received anything through her feeding tube. The defendant responded "no" each time. Dr. Rose examined the victim and saw that her eyes were deviated to one side and that her abdomen was distended. He stepped out of the room to order a blood-gas test and to call security. He then reentered the room and removed the cap from the feeding tube. Bubbles were coming out of the tube, which is not normal. Dr. Rose smelled the feeding tube and detected the smell of acetone or fingernail polish remover. Without commenting on his suspicions, he then asked the defendant to smell the tube. She stated that it smelled like fingernail polish remover. She then volunteered that it could not be anything that she had done because she did not use fingernail polish remover. Dr. Rose continued to examine the victim while questioning the defendant. Her legs were "floppy," and her eyes continued to be deviated to one side. The victim's breathing pattern changed, and she started having gurgling sounds in her breathing. Dr. Rose was concerned that her airway might close and that she could go into cardiac arrest. Dr. Rose realized that the victim was in an emergency situation and that the child was at risk of dying. He attached a syringe to the feeding tube and pulled out the stomach contents. He immediately sent the gastric contents to the lab for testing. The victim was then transferred to the intensive care unit.

Dr. Rose and a social worker then confronted the defendant with the fact that she had been observed giving the victim a substance through the feeding tube. The defendant stated that she knew the cameras were recording the whole time. She claimed that she had given the victim water through the feeding tube and nothing else. Dr. Rose then received the lab results from the testing of the gastric contents. They tested positive for a very high level of acetone. On the morning of September 13, before the victim was moved to the monitoring room, she had a blood acetone ratio of 1:4. The gastric contents had an acetone ratio of 1:1024. The victim's blood acetone ratio at 4:00 the next morning was 0.4 percent. Approximately five hours later, her acetone level was still at 0.31 percent. Dr. Rose stated that if he had not removed the stomach contents when he did, even more would have been absorbed. A toxic level is considered to be 0.02 percent. Almost twelve hours after the event, her acetone level was twenty times higher than what is considered to be toxic. The victim recovered while in the intensive care unit.

Eric Cage, the victim's father, arrived at the hospital shortly after the event had occurred. He and the defendant had been separated since 1993. He had been with the victim in the monitoring room earlier that day. Mr. Cage indicated that the victim was fine when he saw her. She was having no problems breathing, her eyes looked normal, and she did not have a distended stomach. Dr. Rose took him aside and explained what had happened. At first, he was in disbelief. Dr. Rose took him into the control room and showed him the tape of the defendant injecting the victim. Mr. Cage left the control room and went into the monitoring room. He looked through the defendant's bag and found a nearly empty bottle of fingernail polish remover. Carl Bailey and other hospital security officers arrived on the scene a few minutes after being summoned by Dr. Rose. Mr. Cage turned the bottle of fingernail polish remover over to security. Security also removed two syringes and a hydrogen peroxide bottle from the room. The items were later turned over to the police.

The police turned the items over to a toxicology lab for testing. The gastric contents contained acetone. The fingernail polish remover bottle tested positive for acetone. There was no acetone found on the syringe tested or on the hydrogen peroxide bottle tested. The other syringe was apparently lost. Harold Nichols, a forensic toxicologist, testified that one would likely not detect the presence of acetone on a syringe exposed to the air. He stated that acetone would evaporate in a matter of minutes at room temperature. The gastric contents were apparently destroyed by the lab, prior to trial.

Dr. Rose testified that, in his opinion, there was a direct relationship between what was introduced by the defendant and the victim's reaction. Water would not cause those symptoms. In his medical opinion, acetone caused the symptoms. Dr. Rose did not know of any other medication, condition, or anything that would account for the victim's symptoms. He testified that the level of acetone present in the victim after the defendant injected the substance could not have been present when he saw the infant a few minutes earlier. He stated:

> Acetone is rapidly absorbed in the body . . . . With that much acetone, I would not have seen a normal baby when I walked into the room just before the - - the incident of the syringes occurred. I would - - I would not have seen a normal child. So that was my medical opinion. That was something that was introduced into the - - into

the stomach. And from the stomach moved into the body . . . . [Acetone is] a toxin. And it could well account for all the findings that I saw.

Mr. Cage has had custody of the victim ever since this event occurred. The victim's feeding tube was removed approximately six months after this episode. She has had no more seizure-like episodes since that day.

The defendant testified at trial. She stated that she had never done anything to harm the victim. She did not know how the fingernail polish remover got in her bag. She admits turning off the lights and injecting a substance into the child's feeding tube, but stated that it was only water. She said that on the tape, she was looking at the television and not at the door while injecting the victim. The defendant was found guilty of aggravated child abuse.

## Analysis

The defendant contends on appeal that the evidence was insufficient to support the conviction, and the trial court erred in allowing testimony by Dr. Lazar concerning the effects of acetone. We first address the sufficiency of the evidence claim. When a defendant challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, (1979); State v. Evans, 838 S.W.2d 185, 190-91 (Tenn. 1992). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). This Court will not re-weigh the evidence, reevaluate the evidence, or substitute its evidentiary inferences for those reached by the jury. State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995). Furthermore, in a criminal trial, great weight is given to the result reached by the jury. State v. Johnson, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995).

Once approved by the trial court, a jury verdict accredits the witnesses presented by the State and resolves all conflicts in favor of the State. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as trier of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). A jury's guilty verdict removes the presumption of innocence enjoyed by the defendant at trial and raises a presumption of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant then bears the burden of overcoming this presumption of guilt on appeal. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991).

The defendant first contends that the evidence was insufficient to establish that the victim suffered "serious bodily injury." A person commits the offense of aggravated child abuse when that person knowingly, other than by accidental means, treats a child under eighteen years of age in such a manner as to inflict injury, and the act of abuse results in serious bodily injury. Tenn. Code Ann.

§§ 39-15-401(a), 39-15-402(a)(1). If the child is less than six years of age, the offense is a Class A felony. Id. at -402(b). Serious bodily injury is defined as bodily injury which involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. Id. at -11-106(a)(34).

After viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that the victim suffered serious bodily injury. Dr. Rose testified that after the victim was injected by the mother, her legs were "floppy" and her eyes were deviated to one side. The victim's breathing pattern changed, and she started having gurgling sounds in her breathing. Dr. Rose was concerned that her airway might close and that she could go into cardiac arrest. Dr. Rose realized that the victim was in an emergency situation and that the child was at risk of dying. He attached a syringe to the feeding tube and pulled out the stomach contents. Dr. Rose then received the lab results from the testing of the gastric contents.

The stomach contents tested positive for a very high level of acetone. On the morning of September 13, before the victim was moved to the monitoring room, she had a blood acetone ratio of 1:4. The gastric contents had an acetone ratio of 1:1024. The victim's blood acetone ratio at 4:00 the next morning, almost twelve hours after the event, was 0.4 percent. Dr. Rose stated that if he had not removed the stomach contents when he did, even more would have been absorbed. A level of 0.02 percent is considered to be toxic. Her acetone level was twenty times higher than what is considered to be toxic. Approximately five hours later, her acetone level was still at 0.31 percent. Dr. Rose testified that the victim was "at very significant risk" when she was transferred to intensive care. The record supports the jury's finding that the defendant's actions involved "a substantial risk of death." This argument is without merit.

The defendant next contends that the evidence was insufficient to establish that the substance injected into the victim was acetone. The defendant argues that there are problems with the chain of custody of the evidence (syringes, stomach contents, nail polish remover bottle, peroxide bottle) after it left the hospital. We agree with the State's argument that the defendant's guilt was not established by the later testing of items seized from the hospital that day. Therefore, the chain of custody of those items has virtually no bearing on the defendant's guilt or innocence.

It is undisputed that the defendant turned off the lights and injected a liquid substance into the victim. It is undisputed that shortly thereafter, the victim became ill. It is undisputed that an extremely high level of acetone was found in the victim's stomach contents that were removed within minutes of the injections. It is undisputed that an almost empty bottle of fingernail polish remover was found in the monitoring room. It was certainly reasonable for the jury to find that the substance injected by the defendant was acetone and that it alone caused the symptoms suffered by this infant. This argument is without merit.

The defendant also contends on appeal that the trial court erred in allowing testimony by Dr. Lazar concerning the effects of acetone ingestion on the body. When asked about the effects of

acetone ingestion, Dr. Lazar stated that she was not an expert. The defendant objected to the question, and the trial court sustained the objection. However, the trial court indicated that it would allow it if a proper foundation was laid. Questioning continued, and the doctor stated that she had researched the effects of acetone. The court then allowed her to testify that, in her medical opinion, the presence of acetone "could well have caused these symptoms."

The admission of evidence is a matter entrusted to the sound discretion of the trial court, and the trial court's ruling on an evidentiary issue will not be reversed absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). The error will not result in reversal "unless the error affirmatively appears to have affected the result of the trial on the merits, or considering the whole record, the error involves a substantial right which more probably than not affected the judgment or would result in prejudice to the judicial process." State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999) (citations omitted). Even if the admission of this testimony was error, it was harmless. Dr. Rose testified that, in his opinion, there was a direct relationship between what was introduced by the defendant and the victim's reaction. In his medical opinion, acetone caused the symptoms. Dr. Rose did not know of any other medication, condition, or anything that would account for the victim's symptoms. Even without the testimony of Dr. Lazar regarding the effects of acetone, Dr. Rose came to the same conclusion. We cannot say that the admission of Dr. Lazar's brief statement about the effects of acetone more probably than not affected the result of the trial. This issue is without merit.

## Conclusion

The evidence presented was sufficient to support the conviction, and any error in admitting the testimony of Dr. Lazar concerning the effects of acetone was harmless. Based on the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE