IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 21, 2026 at Knoxville

**STATE OF TENNESSEE v. CAMRY CHRISHAY VEAZEY**

**Appeal from the Criminal Court for Davidson County
No. 2022-C-1432     Angelita Blackshear Dalton, Judge**

———————————————————

**No. M2025-00669-CCA-R3-CD**

———————————————————

The Defendant, Camry Chrishay Veazey, was convicted by a Davidson County Criminal Court jury of aggravated assault, a Class C felony, and reckless endangerment, a Class A misdemeanor.  *See* T.C.A. §§ 39-13-102 (Supp. 2021) (subsequently amended) (aggravated assault), 39-13-103 (2025) (reckless endangerment).  The trial court merged the convictions and imposed a three-year sentence, to be served on probation.  On appeal, the Defendant contends that the evidence is insufficient to support her convictions and that the trial court abused its discretion in admitting evidence of a firearm found in the Defendant's car one month after she shot the victim.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and STEVEN W. SWORD, JJ., joined.

Martesha Johnson Moore, District Public Defender; and Ellison M. Berryhill (on appeal), Allison Capp (at trial), and Brittania Poon (at trial), Assistant Public Defenders, for the appellant, Camry Chrishay Veazey.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Matthew Thomas, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

During a December 20, 2021 altercation in the parking lot of a nail salon, the Defendant shot the victim, London Speaks, in the abdomen.  The altercation arose during the Defendant's vandalism of a car which belonged to Arbrey Sowell, with whom both women were romantically involved.  The victim had borrowed the car to go to the nail

salon, while Mr. Sowell remained at the victim's apartment. The details of the altercation form the basis for this case. The Defendant was charged with attempted second degree murder, employing a firearm during the commission of or attempt to commit a dangerous felony, aggravated assault with a deadly weapon, and reckless endangerment with a firearm. At the trial, the defense acknowledged that the Defendant shot the victim but claimed that the Defendant acted in self-defense.

The victim, a U.S. Army recruiter, testified at the trial that she and the Defendant had both dated Mr. Sowell. She said he had deceived both women about whether he was dating the other. She said that she began dating Mr. Sowell in August 2020, at which time he told her he was not in a relationship with anyone else. She said that, in June 2021, she confronted Mr. Sowell after learning that he had been "dealing with" the Defendant. The victim said she told him that he would have to choose between her and the Defendant. The victim denied that she confronted the Defendant in June 2021 after learning that the Defendant and Mr. Sowell were seeing each other. The victim said that Mr. Sowell convinced her to go to Atlanta with him over the July Fourth weekend of 2021 and that, unbeknownst to her, Mr. Sowell had also invited the Defendant on the trip. She identified a photograph of herself and the Defendant taken on the Atlanta trip, and the photograph was received as an exhibit. The victim said that she, the Defendant, and Mr. Sowell were never in a three-person relationship with one another and denied that the three of them had a mutual sexual encounter in Atlanta. The victim said that she "didn't have a problem with" the Defendant on the trip and that the Defendant "was cordial to" her. The victim initially denied that she invited the Defendant on the Atlanta trip but later acknowledged a text message conversation between her and the Defendant in which the victim suggested a trip to Atlanta.

The victim said that, after the trip, Mr. Sowell said the Defendant was "mad" about "such and such," which she said was "just petty stuff." The victim said that she assumed that Mr. Sowell had invited the Defendant on the trip because the Defendant was "[d]ating him too[.]" The victim said, "He had her around because they had got into some other legal issues before me, and he had her around for his reasons."

The victim testified that, on December 20, 2021, Mr. Sowell lived with her at her Nashville apartment. She explained that she worked in California and traveled to Nashville on weekends. The victim believed that she and Mr. Sowell were in a serious relationship and said she had his name tattooed on her arm.

The victim testified that on the day of the shooting, she asked Mr. Sowell to take her to the nail salon but that he told her to drive his car, which she did. She said that while she was inside the salon, she saw the Defendant and the Defendant's daughter enter and leave the business. She said Mr. Sowell called her a few minutes later and told her, "This

'B' is busting out my windows," which she said referred to Mr. Sowell's car windows. The victim said she remained on the call and went to the parking lot. She said she saw the Defendant "looking for a brick," pick up a rock, and shattered two of the car's windows with the rock. She said the Defendant removed the car's license plate.

The victim testified that she told the Defendant, "You might as well leave 'cause I'm recording you, and I'm calling the police." The victim said the Defendant responded, "Shut up, b----, before I beat your a--." The victim said that, after the Defendant broke the windows, the Defendant "charged" and threw the rock at her. The victim said she dodged the rock. Video recordings from the victim's cell phone were received as an exhibit and showed the Defendant hitting a car window with a rock and coming toward the camera with a rock. The victim said the Defendant retrieved a gun from the Defendant's car and fired it into the air before putting it into her pocket. The victim said she did not say anything to the Defendant, who "charged" at her and "threw the first punch." The victim did not recall telling the Defendant, "If you want to fight, we can fight, but put the gun down."

The victim testified that she and the Defendant fought, "throwing punches back and forth" for a brief time. The victim said the gun fell from the Defendant's pocket "but was nowhere near" the women. The victim said the Defendant went to retrieve the gun, which was "a few feet away" and beyond the Defendant's "reaching distance." The victim said she did not try to get the gun. The victim said she and the Defendant continued "tussling" as the Defendant retrieved the gun, but the victim also said the Defendant stopped fighting when the Defendant reached for the gun. The victim said she punched the Defendant as the Defendant bent to get the gun but did not place the Defendant in a choke hold. The victim later said she did not recall whether she put her arm around the victim's neck. She acknowledged that she had received hand-to-hand combat training in the Army. The victim agreed that she was hitting the Defendant's back and head while the Defendant was bent to reach the gun. The victim said the Defendant never said that the Defendant "was done fighting" before reaching for the gun. The victim said the Defendant grabbed the gun, touched it to the victim's stomach without standing up, and fired the gun. The victim estimated that the fight lasted seven seconds or less. The victim said that the Defendant "took off" in her car without checking on the victim. The victim said she returned to the nail salon, where she realized that she was bleeding. She said someone in the salon called 9-1-1.

The victim described the Defendant's gun as a purple and black handgun. The victim thought the gun was a .22-caliber Ruger. When shown a photograph of a gun, she said it looked like the one the Defendant used to shoot her.

The victim testified that she was hospitalized for three days, underwent emergency surgery, and had twenty-three staples. She agreed that the bullet went through her body

and that none of her organs were hit. She identified a photograph of herself, which depicted her surgical incision. She said she was unable to work for two months, lost her appetite for a while, and was paranoid for "quite [a] bit of time." She had been diagnosed with PTSD and was receiving mental health treatment. Her medical records were received as an exhibit.

The victim testified that she did not socialize with the Defendant when the victim was in Nashville on the weekends after the Atlanta trip, but she later acknowledged her prior testimony that she had seen the Defendant at a bar and "had words with" her. She clarified that she and the Defendant had not gone to the bar together. She said that on one occasion, she and Mr. Sowell had been at someone's house and that the Defendant "knocked on the door and ran." The victim said Mr. Sowell told her that the Defendant had been mad.

Metropolitan Nashville Police Department (MNPD) Crime Scene Investigator Kenneth Wolfe testified that he processed the crime scene outside the nail salon on December 20, 2021. He identified photographs of the scene, which were shown to the jury. Referring to the photographs, he described the scene. He identified two .380-caliber, automatic cartridge casings, a rock, and a hair "weave" he collected as evidence.

MNPD Officer Ciarra Rench testified that she, along with Rutherford County officers, served the arrest warrant on the Defendant on January 26, 2022. After Officer Rench saw the Defendant leave a house and drive away, the Rutherford County officers conducted a traffic stop. The Defendant's car was searched, and two handguns were found, a purple and black .380-caliber Ruger under the passenger's seat and a pink .9-millimeter handgun inside the passenger-side glove box. She said both guns contained live ammunition in their respective magazines but that their chambers were clear.

At the close of the State's proof, the prosecutor specified that the State relied on the Defendant's shooting into the air as the factual basis for Count 4, charging reckless endangerment with a firearm. The Defendant moved for judgment of acquittal on all counts, and the trial court granted the motion as to Count 4 but denied it as to the remaining counts.

The Defendant testified that she fought with the victim on December 20, 2021. The Defendant acknowledged that she fired a handgun during the fight, but she said she had not aimed at the victim and had not tried to kill the victim.

The Defendant testified that she met Mr. Sowell in February 2017 and that they "became romantic" in December 2017, at which time Mr. Sowell moved into her home. She said he had been a father figure to her children. She said the Defendant moved out of

- 4 -

her home around March 2021, after she learned that he had outstanding warrants. She explained that she did not want her children to be in danger from "bounty hunters and stuff like that coming to [her] house."

The Defendant testified that she legally purchased a purple and black .380-caliber Ruger handgun in January 2021 and that she was its registered owner. She said the pink handgun that had been shown to the jury earlier in the trial was her sister's legally owned and registered handgun. The Defendant agreed that she had completed gun safety training in order to obtain a handgun carry permit. She said that she kept the gun in a lockbox at home and that she took it with her when she left home. She said that, after having had a gun she owned previously stolen from her car, she typically took the gun with her when she got out of her car.

The Defendant testified that, in April 2021, she went with Mr. Sowell to a car dealership, where he purchased a blue Kia Stinger GT. She said the car was titled in a third party's name, who was a friend, but that Mr. Sowell made the car payments. She said that her address was on the payment contract and that the insurance "was in [her] name." She identified an "insurance card" and said the Kia had been insured on December 20, 2021. She said that the insurance card listed her and the third party as the insureds but that Mr. Sowell was the Kia's primary driver. She said no one else regularly used the Kia.

The Defendant testified that the victim contacted her in a text message sometime around her June 15, 2021 birthday. She said she "kind of figured it was about Mr. Sowell." The Defendant said she asked Mr. Sowell about the victim and that he denied knowing her and said he did not know why the victim would contact the Defendant. She said she believed him because he had always given her "princess treatment."

The Defendant testified that she and the victim continued to communicate through text messages. The Defendant said the victim invited her on a trip to Atlanta over the July 4, 2021 weekend. The Defendant said she, the victim, and Mr. Sowell went on the trip and had fun. The Defendant said they had a "threesome" sexual encounter while on the trip. The Defendant said she had participated in this encounter because she wanted to please Mr. Sowell.

The Defendant testified that, after the Atlanta trip, she saw the victim on the weekends when the victim flew from California to Nashville and that she, the victim, and Mr. Sowell socialized and had sexual encounters together. The Defendant agreed that she and the victim also socialized without Mr. Sowell during this time. The Defendant said she gave the victim some recommendations for beauty service providers, including the nail salon where the December 20, 2021 incident occurred.

- 5 -

The Defendant testified that she stopped speaking to the victim in September 2021 because she realized that the victim was a "fun girl" and was not the Defendant's "style." The Defendant said that she did not want to continue a sexual relationship with the victim and that she wanted to have a relationship between her and Mr. Sowell, with no one else involved. The Defendant said she discussed this with Mr. Sowell, who said he was not going to see the victim anymore. The Defendant said she believed him.

The Defendant testified that, on December 20, 2021, she believed that Mr. Sowell was no longer "talking to" the victim. The Defendant said she went to the nail salon on December 20 because she needed a nail repair. She said she saw Mr. Sowell's Kia in the parking lot. She said that, coincidentally, Mr. Sowell called her, and that she asked him why his car was at the salon. She said he claimed that his male friend "Tato" was driving his car. She said she did not believe him. She said she entered the nail salon, where she saw the victim. The Defendant said she felt betrayed by Mr. Sowell and was mad at him for lying to her. She said she decided that she was "going to go tear up his car" and called him to tell him what she was going to do. She said she had put her gun in her pocket before she entered the nail salon because it was her usual practice and not because she planned to use it.

The Defendant testified that she picked up a brick and began bashing the Kia's passenger-side window. She said she did not see the victim at this point. The Defendant acknowledged that she had taken the gun out of her pocket to shoot a rear tire on the Kia. She said she had missed the tire and had returned the gun to her pocket. The Defendant said she went to the driver's side and began bashing the window. She said she saw the victim and heard the victim asking her to stop and threatening to call the police. The Defendant said she was about to begin bashing the rear window when the victim said something. The Defendant said the victim might have called her "a 'B' word or whatever." The Defendant said she threw the brick "at [the victim] or in her direction" but that it did not hit the victim. The Defendant said the victim "ran up on" her and hit the Defendant's face.

The Defendant agreed that she and the victim punched each other during the fight. The Defendant said the victim was "getting the best of" her and had ripped the Defendant's wig from her head. The Defendant agreed that her gun fell from her pocket during the fight. The Defendant said the victim kicked the gun away from them. The Defendant said she bent to pick up the gun and was no longer fighting with the victim. The Defendant said she did not have to step away from the victim to get to the gun, which was in front of her. She said the victim was behind her and was still hitting her head and back. The Defendant said the victim was "beating the h--- out of [the Defendant] in [her] head" as the Defendant retrieved the gun. The Defendant said she put the gun in her pocket and was unable to stand after retrieving the gun because of the beating she was receiving on her back and

head.  The Defendant said she tried to protect her head.  She said the victim began choking her.  The Defendant said the victim put her arm around the Defendant's neck in "a hold or something[,] a grip or something."  The Defendant said the hold the victim placed on her neck "was . . . getting tight" and was impairing the Defendant's ability to breathe.  The Defendant said that she tried to pry away the victim's arm, that she told the victim that she could not breathe, and that the victim did not loosen her grip.  The Defendant said she thought she was going to die.  She described the victim as on her back as she bent to get the gun, "like a piggyback ride almost."  The Defendant said that after she told the victim a couple of times to release her and was unable to free herself, she reached in her pocket for the gun and fired the gun "backwards" once.  The Defendant said that she was "just aiming backwards" to fire a warning shot and that she had not aimed at the victim.  The Defendant said she could not see when she fired the gun.  She denied that she felt her gun touch anything before she fired the shot.  She said the victim released her after the gunshot, started swearing, and went into the nail salon.  The Defendant said that she questioned "for a second" whether the victim had been shot and that she had not seen blood.  The Defendant said she left in her car.  She said she did not wait for the police to arrive because she did not know the victim had been shot.

The Defendant testified that her lip was "busted" in the fight, that her face was scratched, and that her throat hurt from having been choked.  The Defendant said her head was irritated from the victim's ripping her wig from her head.  She explained that the wig had been glued to her head.  She did not seek medical treatment.

The Defendant acknowledged that she was arrested about one month later, on January 26, 2022.  She said she was never interviewed by a police officer about the December 20, 2021 incident before her arrest.

When asked why she fired the gun, the Defendant stated:

Because I couldn't.  I was down.  Like, she had beat me up.  I'm older.  Like, I was down.  I was scared for my life.  Like, I felt like I was going to die, and she was choking me out.  I couldn't – I couldn't take this no more.  That's why I stopped fighting.  I couldn't – then she choked me out.  I was down, so that's why I fired the shot.

The Defendant disagreed with the victim's testimony that the Defendant had fired a shot into the air during the incident.

When asked who started the fight, the Defendant said that she had thrown the brick in the direction of the victim but that it had missed the victim.  The Defendant said the victim hit her first and that the victim did not have to hit her.  The Defendant estimated that

- 7 -

the fight lasted five to seven minutes. She said they fought for six or seven minutes before the gun fell from her pocket.

The State recalled the victim on rebuttal, and she testified that the Defendant never shot at a tire. The victim said that the Defendant did not have a gun in her pocket when the Defendant threw the brick at her. The victim said that after the Defendant threw the brick, the Defendant ran to her car and shot into the air while beside her car. The victim said the fight lasted five to seven seconds and disagreed with the Defendant's testimony that it lasted five to seven minutes. The victim denied choking the Defendant. The victim said the Defendant held the gun to the victim's stomach as the Defendant pulled the trigger.

After receiving the proof, the jury found the Defendant guilty of misdemeanor reckless endangerment as a lesser-included offense of the charged offense of attempted second degree murder, not guilty of employing a firearm during the commission of a dangerous felony, and guilty of the charged offense of aggravated assault.

At a sentencing hearing, the trial court merged the convictions and imposed a three-year sentence, to be served on probation. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her convictions of reckless endangerment and aggravated assault. She argues that the evidence established that she acted in self-defense. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

### A. Aggravated Assault

At the time of the offense and as relevant to the present case, "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . [i]nvolved the use or display of a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(iii) (Supp. 2021) (subsequently amended). A firearm is a deadly weapon. *Id*. § 39-11-106(a)(6)(A) (Supp. 2021) (subsequently amended). As relevant here, the assault statute provides, "A person commits assault who . . . [i]ntentionally [or] knowingly . . . causes bodily injury to another[.]" *Id.* § 39-13-101(a)(1) (2025).

The Code provides the following with respect to the *mens rea* requirements:

- 8 -

(a) Intentional" refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

(b) "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id*. § 39-11-302 (2025).

The self-defense statute provides:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

     (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

     (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

     (C) The belief of danger is founded upon reasonable grounds;

. . .

(e) The threat or use of force against another is not justified:

. . .

(2) If the person using force provoked the other individual's use or attempted use of unlawful force, unless:

>   (A) The person using force abandons the encounter or clearly communicates to the other the intent to do so; and

>   (B) The other person nevertheless continues or attempts to use unlawful force against the person[.]

*Id*. § 39-11-611(b)(1), (2)(A)-(C), (e)(2)(A)-(B) (2025). Once a defendant has raised sufficient facts to support a finding that the defendant acted in defense of self, "[t]he state has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996) (citing T.C.A. § 39-11-201(a)(3)).

The Defendant acknowledges that she used a deadly weapon during the incident, but she argues that the evidence fails to establish beyond a reasonable doubt that she intentionally or knowingly caused bodily injury to the victim. The Defendant argues that "the parties were fighting" and she acted in self-defense in firing the gun backwards without knowing the exact location of the victim's body. The Defendant argues that, despite the evidence that she started the fight, she abandoned it when she "stopped fighting in order to go pick . . . up" the gun. The Defendant claims that she "was not thinking enough about it to be acting knowingly or intentionally." She notes that the victim was getting the better of her in the fight and was punching the back of her head, rendering her in a vulnerable position, when she fired the gun. She argues that firing the shot was a reasonable act of self-defense.

The State argues that the Defendant shot the victim in the culmination of a fight the Defendant started. The State argues, further, that the evidence fails to support the conclusion that the Defendant abandoned the fight and that it shows, instead, that she shot the victim during mutual combat. The State asserts that the moment when the Defendant stopped throwing punches in order to retrieve the gun was not an abandonment of the fight.

Viewed in the light most favorable to the State, the evidence shows that the Defendant became enraged upon realizing that the victim was likely driving Mr. Sowell's car, from which she inferred that Mr. Sowell had deceived her and was surreptitiously involved with the victim. The Defendant vandalized Mr. Sowell's car, and after the victim admonished her to stop or the victim would call law enforcement, the Defendant threw a rock or brick at the victim. A fight ensued. When the Defendant's gun fell from her pocket, she bent to get it, returned it to her pocket, then retrieved it. The victim testified that the Defendant touched the gun to the victim's abdomen and fired the gun. Having just fired

the gun into the air, as the victim testified, or at the Kia's tire, as the Defendant testified, the Defendant was aware that the gun was loaded. A reasonable person in the Defendant's circumstances would be aware that firing a gun into the victim's abdomen was reasonably certain to cause bodily injury to the victim.

As to the Defendant's self-defense claim, the Defendant initiated the fight by throwing a rock at the victim and continued to engage in the illegal conduct of assaulting the victim when she retrieved and then fired the gun. *See* T.C.A. § 39-13-101(a)(1). A rational jury could conclude that the Defendant's momentary shift from hitting the victim to bending to retrieve the gun was not an abandonment of or communication of an intent to abandon the fight. *See id.* § 39-13-611(e)(2)(A)-(B). To the contrary, bending to reach for a gun in order to introduce it into the fight could fairly be viewed as an escalation of the fight. The evidence, viewed in the light most favorable to the State, is sufficient to negate the Defendant's self-defense claim. *See Belser*, 945 S.W.2d at 782.

The evidence is sufficient to support the Defendant's guilt beyond a reasonable doubt of aggravated assault. The Defendant is not entitled to relief on this basis.

### B. Reckless Endangerment

"A person . . . who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" commits the offense of misdemeanor reckless endangerment. T.C.A. § 39-13-103(a) (2025).

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* § 39-11-302(c).

The Defendant argues, again, that she acted in self-defense, and therefore, the evidence does not support the reckless endangerment conviction. The Defendant was convicted of this offense as a lesser included offense of attempted second degree murder. The State counters that the evidence is sufficient to support the conviction and does not support the Defendant's self-defense claim.

Viewed in the light most favorable to the State, the evidence shows that, when the Defendant fired her gun, she consciously disregarded the substantial and unjustifiable risk that the victim would be shot. As we discussed above, the evidence is sufficient to negate the Defendant's self-defense claim.

The evidence is sufficient to support the reckless endangerment conviction. The Defendant is not entitled to relief on this basis.

## II

### Admission of Firearm Evidence

The Defendant contends that the trial court abused its discretion in admitting evidence the pink handgun found in the Defendant's car at the time of her arrest, one month after the offenses. The State responds that the court did not abuse its discretion and that, even if it did, the error was harmless. We conclude that the court abused its discretion in admitting the evidence but that the erroneous admission of the evidence was harmless.

The record reflects that two handguns were recovered at the time of the Defendant's arrest, a purple and black Ruger and a pink one of an unidentified brand. The Defendant filed a motion in limine to exclude the evidence of both guns. The admission of the pink gun is the one challenged on appeal. The defense alleged in its motion in the trial court that neither firearm had been tested to determine if either had fired the bullet casings found at the scene and that no information had been ascertained as to the guns' owner or owners. The defense also alleged that the arrest had been one month after the December 20, 2021 incident.

At the hearing on the Defendant's motion in limine, defense counsel argued that the evidence of the handguns was irrelevant and that any probative value which might be assigned to the evidence was outweighed by the danger of unfair prejudice. Thus, the defense argued that the evidence should be excluded pursuant to Tennessee Rules of Evidence 401, 402, and 403. The State countered that the guns were possessed lawfully, that the victim had testified at a previous hearing that the Defendant shot her with a purple and black handgun, and that the evidence of the guns was "very probative . . . and not prejudicial at all." In response to the State's argument, the defense stated that even if the trial court accepted the State's position that the purple and black gun was relevant and admissible, the court should nevertheless exclude the pink gun.

After hearing the parties' arguments, the court framed the question as whether the evidence

- 12 -

establish[ed] something, such as motive, intent, guilt, or knowledge – any of those factors that we've often considered, and I think here it can go towards possibly establishing opportunity, especially considering the alleged victim's description of the purple and black gun at the preliminary hearing, and the fact that one of the two guns that was found was a purple and black gun.

The court deferred its ruling and later filed a written order, in which it found that the evidence of the guns was relevant to establish the Defendant's motive, intent, or opportunity. The court found that the evidence was not unfairly prejudicial. As to the purple and black gun, the court noted that it matched the victim's description of the gun the Defendant used to shoot her and held that the evidence was admissible. As to the pink gun, the court found that its presence in the Defendant's car at the time of her arrest was "not unduly prejudicial, considering that individuals who are not otherwise prohibited by law from possessing firearms may do so." The court also found that the presence of both weapons was relevant to show the Defendant's motive, intent, or opportunity to shoot the victim. Thus, the court denied the motion in limine to exclude the evidence of the guns.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

In the present case, the Defendant acknowledged that she shot the victim. The question before the jury was whether the Defendant possessed criminal intent or acted in self-defense. Her possession of an unrelated gun one month after the shooting had no tendency to show her motive, opportunity, or intent to shoot the victim with criminal intent. *See* Tenn. R. Evid. 401, 402. The trial court erred in concluding to the contrary, and it abused its discretion in admitting the evidence of the pink handgun.

The remaining question is whether the erroneous admission of the evidence occasions reversible error or whether it is harmless error. Recognizing that all errors are not equal, our supreme court has established three categories of error – structural constitutional error, non-structural constitutional error, and non-constitutional error. *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). The distinctions between these categories dictate the standards to be applied when determining whether a particular error is harmless. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). A trial

court's error in admitting evidence under the Tennessee Rules of Evidence falls into the category of non-constitutional error, and harmless error analysis under Tennessee Rule of Appellate Procedure 36(b) is appropriate. *See State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014); *see also State v. James*, 81 S.W.3d 751, 763 (Tenn. 2002) (noting that "[h]armless error analysis applies to virtually all evidentiary errors other than judicial bias and denial of counsel"). Pursuant to Rule 36(b), the defendant bears the burden of showing that a non-constitutional error "more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b); *see Rodriguez*, 254 S.W.3d at 372.

The pink gun was mentioned briefly during the State's case-in-chief, when Officer Rench testified that two guns were recovered when the Defendant was arrested. The Defendant later testified that the pink gun belonged to her sister, whose ownership and possession of it was lawful. Given the gun's lack of probative value to the questions before the jury and the lack of any inherent inflammatory nature of evidence of a lawfully owned gun's presence in the Defendant's car one month after the crimes, we cannot conclude that the evidence more probably than not affected the verdict. *See* T.R.A.P. 36(b). The error was harmless. *See id.* The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE

- 14 -